## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHERIE EASTERLING, | : | CIVIL ACTION  NO.3:08CV0826(JCH) |
| individually and on behalf of | : | |
| all others similarly situated, | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT, | : | |
| DEPARTMENT OF CORRECTION, | : | |
| *Defendant* | : | April 18, 2011 |

## DEFENDANT'S REPLY MEMORANDUM
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

This reply brief responds to Memorandum in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment.  For the reasons set forth below, the Court should deny Plaintiffs' Motion for Summary Judgment and grant judgment in favor of Defendant.

## I.    ARGUMENT

### A.    Plaintiffs Have Failed to Establish a *Prima Facie* Case of Disparate Impact.

#### 1.    *Defendant Disputes the First Element of Plaintiffs'* Prima Facie *Case To The Extent Plaintiffs Define The Employment Practice In Reference To A Specific Job Position.*

Plaintiffs assert that "Defendant does not dispute that Plaintiffs have satisfied the first requirement for a *prima facie* case" by identifying the employment practice at issue.  (Pls.' Mem. Opp. 2.)  Defendant contends that the employment practice at issue is DAS' use of the 1.5 mile run test with age and gender normed cut scores.  (Pls.' Exs. 10-12; Pls.' Ex. 14 at 103.)

Under a disparate impact theory of liability, Title VII requires that the "complaining party demonstrate that a respondent uses a *particular employment practice* that causes a disparate

impact on the basis of race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(k)(1)(A)(i) (emphasis added).  By contrast, to avoid liability, the respondent must "demonstrate that the challenged practice is job related for the *position in question* and consistent with business necessity."  *Id.* (emphasis added).  In identifying a particular employment practice, a plaintiff "generally cannot attack an overall decision making process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact."  *Malave v. Potter*, 320 F.3d 321, 327 (2d Cir. 2003) (citations and internal quotations omitted).

Here, Plaintiff has stated that "The employment practice at issue is DOC's use of a 1.5 mile run test with age and gender normed cut scores that disproportionately eliminated female applicants for the CO job."  (Pls.' Mem. Opp. 2.)  While Defendant does not dispute that Plaintiff has identified a particular element of the selection process (the 1.5 mile run), under the language of the statute, the "particular employment practice" is not defined by the "position in question." Thus, the relevant employment practice is DAS' use of the 1.5 mile run and not only for the CO position.  In order words, Plaintiff cannot subdivide the candidate pool for the particular employment practice to demonstrate adverse impact.

2.  *Plaintiffs' Showing of Disparate Impact is Based on the Incorrect Applicant Pool.*

Defendant maintains that Plaintiff has failed to establish a *prima facie* case of disparate impact discrimination because proper statistical analysis would aggregate the data for all law enforcement applicants subject to the challenged employment practice for the 2004 and 2006 physical fitness test administrations.  There is no violation of the 4/5[th] rule, and thus no disparate

impact, when the test results for the 1.5 mile run for all law enforcement applicants are aggregated.  (Def.'s Mem. Supp. Summ. J. 12-13; Def.'s Ex. 1, Attachment G.)

First, in opposition to Defendant's Motion for Summary Judgment, Plaintiffs argue that none of the cases upon which Defendant relies to support its aggregation argument are applicable in this case.  (Pls.' Mem. Opp. 4-5.)  Plaintiffs cite *Pietras v. Board of Dire Com'rs of Farmingville*, 180 F.3d 468, 474 (2d Cir. 1999), as an example of a case where a court aggregated data based on a concern of a small sample size, which Plaintiffs argue is not at issue here  (Pls.' Mem. Opp. 4.)  However, the court's rationale for inclusion of all employees who took the physical agility test regardless of job position, and not just plaintiff's position of probationary firefighter, was not because of a small sample size.  Rather, the court concluded that the appropriate data included all job positions because "the statistical analysis of the PAT results was designed to evaluate the impact of the test on women generally, and not merely on women who were probationary firefighters."  *Pietras*, 180 F.3d at 474.

Plaintiffs also argue that the court in *Paige v. California*, 291 F.3d 1141 (9th Cir. 2002), aggregated data based on a concern that the small sample size would distort the statistical analysis.  (Pls.' Mem. Opp. 4.)  The Ninth Circuit noted that "aggregation of data may be used where it is more probative than subdivided data."  291 F.3d at 1148.  While the court added that aggregation is "particularly appropriate where small sample size may distort the statistical analysis," there is no indication that the court intended a concern about sample size to be the only time aggregation is appropriate.  *Id.*  Without reference to a concern about sample size, the court found that "aggregation of supervisory positions [was] more probative than subdivided data," especially in light of the "sufficient commonality among the duties and skills required by" the positions.  *Id.*

Plaintiffs' assertion that the court in *Stagi v. AMTRAK*, 2010 U.S. App. LEXIS 17261 (3d Cir. Aug. 16, 2010), aggregated data only for class members is incorrect as the class was never certified.  The Third Circuit in *Stagi* held that aggregation of employees for statistical purposes was not improper even though the employees had different jobs, with different qualifications, and may never have been in competition with each other.  2010 U.S. App. LEXIS 17261, at *38.

Notably, Plaintiffs do not attempt to distinguish *Smith v. Xerox*, 196 F.3d 358, 365 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006), where the Second Circuit held that the plaintiffs had failed to prove their *prima facie* case because the statistical methodology that disaggregated employees by work unit lacked probative value as it could not show whether the challenged employment practice actually caused a disparate impact as a whole.  196 F.3d at 369.  The court continued, "It is only reasonable to infer a disparate impact from the IRIF decision-making process *if all persons who were subject to the process are included in the analysis*."  *Id.* at 370 (emphasis added).  In *Xerox*, "all persons who were subject to the challenged employment process" included thousands of employees with different jobs, even outside plaintiffs' work groups.  *Id.* at 368-70.

Next, Plaintiffs claim that Defendant is trying to aggregate data for "applicants for other, unrelated jobs, with other employers."  (Pls.' Mem. Opp. 3.)  Defendant maintains, however, that it is appropriate to aggregate the data for the 1.5 mile run (the challenged employment practice) for the three classifications of law enforcement positions – Correction Officer Cadet, State Police Trooper Trainee, and Protective Services Trainee.  There is evidence in the record that these positions are sufficiently similar.  Here, there is one employer:  the State of Connecticut. Correction Officer Cadets, State Police Trooper Trainees, and Protective Services Trainees are all "state employees."  The physical fitness test is created and administered by one agency:

Department of Administrative Services.  (Pls.' Exs. 10-12.)  During the class period, the PFT

contained the same elements for all three job positions with the same cut scores:  sit and reach

test, sit-ups, push-ups, and a 1.5 mile run.  *Id.*  DAS administered the PFT to one type of job:

law enforcement.[1]  *Id.*  DAS administered the PFT at one time for all law enforcement

applicants.  *Id.*  Significantly, an individual could apply for multiple law enforcement positions,

but would only take the physical fitness test once.  For example, in 2004, 1,024 applicants

applied to be a Correction Officer Cadet *and* another law enforcement position (State Police

Trooper Trainee and/or Protective Services Trainee). (Def.'s Ex. 15.)  In 2006, 2,066 applicants

applied to be a Correction Officer Cadet *and* a State Trooper Trainee and/or Protective Services

Trainee.  *Id.*

       Plaintiffs' argument that the differences in the qualifications, duties, skills, and training

for each position preclude a finding of commonality is unavailing.  (Pls.' Mem. Opp. 5.)  As in

*Paige*, the specific positions – Correction Officer, State Police Trooper, and Protective Service

Officer – are sufficiently similar as to warrant aggregation.  Correction Officers and State

Troopers are included in the definition of "hazardous duty members" for purposes of the State

Employees Retirement Act.  *See* Conn. Gen. Stat. §§ 5-173, 192f.  As a result, they receive

enhanced pension and workers compensation benefits.  By collective bargaining agreement,

Protective Service Officers are eligible for hazardous duty pay.  Furthermore, they also are

included in the Tier II retirement plan as hazardous duty employees.  *See*

http://www.osc.state.ct.us/rbsd/hazduty/classcode.asp.  Defendant's expert, Dr. Libby, testified that

although the environment in which correction officers and state troopers perform their duties

may differ, the functions of state troopers in Connecticut are comparable to corrections officers.

---

[1] Harold Goldstein, Plaintiffs' expert, testified that police and correction officers are both public safety jobs.  (Ex. 5 at 103:5-7.)

(Def.s' Ex. 11 at 21:11-16.)  Based on her knowledge of job analyses that the Department of Administrative Services performed, Libby stated, "When it comes to physical demands of the job, there is a lot of commonality between a police officer, a state police trooper and a correction officer."  (Def.'s Ex. 11 at 20:16-19.)  Plaintiffs cite the differences in qualification requirements for each of the job positions as support for their argument against aggregation.  The differences in the requirements, such as a citizenship requirement, are not substantive differences and are immaterial.  (Pls.' Exs. 35-37.)  The fact that applicants simultaneously apply for multiple law enforcement positions also contradicts Plaintiffs' assertion.

Accordingly, as discussed in Defendant's Memorandum in Support of Summary Judgment, when the aggregated data is analyzed, the cut score for the 1.5 mile run does not result in a disparate impact on women.  (Def.'s Mem. Supp. Summ. J. 12-13.)   Thus, plaintiff has failed to prove a *prima facie* case, and the court should grant Defendant's Motion for Summary Judgment.

### 3. There Is No Causal Relationship Between the 1.5 Mile Run and the Statistical Findings.

Plaintiffs argue that the cut score that Defendant used for the 1.5 mile run caused a disparate impact on the female CO applicants.[2]  In direct contrast to Plaintiffs' assertion, (Pls.' Mem. Opp. 9), Defendant *does dispute* that there is a causal relationship between the cut scores it used and the disparate impact against female CO candidates.  Defendant's evidence of its recruiting methods and the lack of preparation of the female CO candidates directly challenges the causal relationship between the 1.5 mile run and Dr. Vekker's statistical conclusions.  The

---

[2] As should be noted, Plaintiffs consistently mischaracterize the data relating to the 1.5 mile run test for CO applicants since 1998.  (Pls.' Mem. Opp. 8.)  The 1.5 mile run has *not* resulted in adverse impact under the 4/5th rule for CO applicants for every administration of the test between 1998 and 2006.  (Ex. 1, Attachment H).  Analyzing the data for Correction Officer Cadet applicants, for example, in 2000, the selection ratio for the 1.5 mile walk/run was 84.5%.  *Id.*  In 2001, the selection ratio for the position of Correction Officer in the 1.5 mile walk/run was 84.9%.  *Id.*

fact that the cut scores for the 1.5 mile run had a disparate impact on female CO applicants does not mean that the challenged employment practice was the *cause* of the disparate impact. Defendant may demonstrate "that a specific employment practice does not cause the disparate impact." 42 U.S.C § 2000e-2(k)(1)(B)(ii).

As Plaintiffs admitted in their Opposition, Defendant has offered evidence that DOC recruits more broadly for the Correction Officer position than do other agencies for State Police Troopers or Protective Services Officers. (Pls.' Mem. Opp. 4.) Dan Callahan, who is responsible for recruitment at DOC, testified that the goals of the agency's Affirmative Action Plan affect recruiting efforts for the CO position. (Def.'s Ex. 12 at 32:1 – 33:10.) For example, because Hispanic females were one of the goal candidates, DOC did "quite a bit of outreach to the Hispanic community." (Def.'s Ex. 12 at 32:23-33:1.) Callahan testified, "When we do a correction officer exam, we run radio ads in Spanish stations. We try to increase that, that demographic in particular, every year I think is one of our goals. And, really, from a departmental perspective, is one of the areas that we seriously recruit for, because we have, you know, a lack of Hispanic female candidates actually applying and actually taking the test. So we are trying to look to that population as we recruit." (Def.'s Ex. 12 at 32:23-33:10.) More generally, Callahan stated that DOC recruits in advertisements in minority newspapers, buses, churches, and gyms and engages in on the ground recruitment efforts by talking to people, especially during the period applicants can apply. (Def.'s Ex. 12 at 62:23-64:6.)

Plaintiffs assert that "statistics confirm that the *gender* composition of the [CO] applicant pool was not affected by any alleged special recruiting." (Pls.' Mem. Opp. 6-7) (emphasis added). However, this is not the relevant inquiry. Defendant does not allege that the gender composition of the applicant pool changed, but rather that the DOC recruits from a different

applicant base than the other agencies, including more minority focused recruitment.  Discussing

the results of Defendant's recruiting efforts, Dr. Anderson stated that DOC "had very, very

different and large success in bringing African American women to the table to apply for this

job, far in excess of any other recruiting effort that had been made."  (Def.'s Ex. 13 at 119:19-

22.)  Evidence in the record reflects that minority CO applicants failed the PFT and the 1.5 mile

run more than white applicants.  (Def.'s Ex. 1, Attachment H.)  Plaintiffs argue that the Uniform

Guidelines' exception is to encourage employers' affirmative action efforts to diversify their

workforce.  (Pls.'s Opp. 8.)  This was precisely the goal of Defendant's recruitment.  (Def.'s Ex.

3 at 48:1-5.)

Moreover, Defendant has offered evidence that the lack of preparation of female CO

candidates for the PFT contributed to the disparity in the pass rates.  Plaintiffs incorrectly note

that Defendant relies only on the dissent in *Lanning v. SEPTA* to support its argument.  (Pls.'

Mem. Opp. 8, n.5.)  In fact, it was the majority in *Lanning v. SEPTA*, 308 F.3d 286 (3d Cir.

2002) (*Lanning II*) who stated:

> While it is undisputed that SEPTA's 1.5 mile run test has a disparate impact on
> women, it is also undisputed that . . . nearly all the women who trained were able
> to pass after only a moderate amount of training.  It is not, we think, unreasonable
> to expect that women -- and men -- who wish to become SEPTA transit officers,
> and are committed to dealing with issues of public safety on a day-to-day basis,
> would take this necessary step.  Moreover, we do not consider it unreasonable for
> SEPTA to require applicants, who wish to train to meet the job requirements, to
> do so before applying in order to demonstrate their commitment to physical
> fitness.

308 F.3d at 292.  Defendant has offered evidence that female CO candidates who failed the PFT

prepared less than female State Trooper Trainee and Protective Services candidates.  (Def.'s Ex.

1, Attachment K.)  In addition, Defendant presented evidence that a greater percentage of female

CO candidates who failed the PFT indicated that they did not prepare *at all* compared to female State Trooper Trainee and Protective Services candidates. *Id.*

There is also evidence in the record that DAS informed applicants about the specific events on the PFT, including the normed standards and passing scores. (Pls.' Exs. 10, 11, 12, 13.) In this information provided to candidates, DAS highly encouraged applicants to prepare for the PFT and supplied applicants with resources for information about preparing for the test. (Pls.' Exs. 10, 11, 12, 13) ("It is strongly recommended that you begin to prepare for the Physical Fitness test if you have not already begun to do so."). DAS provided applicants with information about the preparation of previous successful candidates: "applicants are most successful if they: are involved in a regular exercise program; begin to prepare for the test at least 6-8 weeks prior to the test and prepare regularly (3-5 time a week) . . . ." (Pls.' Exs. 11, 12.) With respect to the 1.5 mile run, DAS specified, "It should be noted, however, that this event cannot be passed if applicants walk all or most of the distance." (Pls.' Exs. 10, 11, 12, 13.) In 2006, DAS also held informational sessions about the PFT and provided details about the test and demonstrations of the events. (Pls.' Exs. 11, 12.) DAS provided a make-up test in 2006 for those applicants who failed the PFT the first time. (Pls.' Ex. 11.) In September 2006, 336 CO candidates re-took the PFT of the 1,355 CO candidates who were eligible to do so. (Pls.' Ex. 42.)

Lastly, Plaintiffs argue that it was not the atypicality of the applicant pool that resulted in adverse impact, but the atypical pool of women who comprised Cooper's normative sample. (Pls.' Mem. Opp. 8.) If that was accurate, one would expect adverse impact for any population of women taking the 1.5 mile run test notwithstanding the cut score. However, when DAS analyzed the data for all of the law enforcement positions to which it administered the 1.5 mile run, there was no disparate impact on women. (Def.'s Mem. Supp. Summ. J. 12-13; Ex. 1,

Attachment G.)  Additionally, in 2007, DAS continued to administer the 1.5 mile run as part of the PFT to State Police Trooper Trainee and Protective Services Trainee Candidates.  *Id.*  There was no disparate impact with this test administration of the 1.5 mile run.  *Id.*  In fact, the overall ratio of females passing compared with males was .0960 or the females passed at 96% of the rate of the males that passed, greatly exceeding the 80% Rule.  *Id.*  Furthermore, in a publication addressing law enforcement testing, Cooper Institute noted

> [A] recent study published by the Centers for Disease Control and Prevention (CDC) showed that median cardiorespiratory fitness levels of men and women randomly selected to participate in the National Health and Nutrition Examination Survey (NHANES) were similar to median values obtained in Cooper Clinic patients.

(Def.'s Ex. 14.)

Plaintiff's expert, Dr. McArdle, testified that he shared his conclusions about the atypical Cooper pool with the Department of Justice.  (Def.'s Ex. 6 at 52:25-54:18.)  Yet, the DOJ endorses the use of the Cooper age and gender normed standards for the 1.5 mile run.  *See* Consent Decree adopted in *United States of America v. City of Erie*, *Pennsylvania*, Civil Action 04-4 (Def.'s Exs. 9, 10.)  Furthermore, during his deposition on September 20, 2010, Dr. McArdle stated that he has been concerned about the Cooper standards for the 1.5 mile run for 14 or 15 years.  (Def.'s Ex. 6 at 102:24-103:3.)  However, in *Lanning v. SEPTA*, 1998 U.S. Dist. LEXIS 9388 (E.D.Pa. June 25, 1998), Dr. McArdle recommended that SEPTA use a physical fitness test, which included a 1.5 mile run based on Cooper's normative data at the 50% percentile:

> Dr. McArdle's proposed test requires that an applicant achieve a fitness level at the fiftieth percentile for his/her sex on each of the fitness measures based on the normative data gathered by the Cooper Institute . . . [E]ach candidate must achieve a physical fitness level at the fiftieth percentile for their sex on the aerobic capacity test.  For male candidates, the fiftieth percentile corresponds to a running

> time of 12:18; for female candidates, the corresponding run time of 14:55 is
> required.

1998 U.S. Dist. LEXIS 9388, at *141-42.  Dr. McArdle testified that although he had concerns

about the Cooper norms at that time of *Lanning*, he was using "a fitness measure that [was]

based on normative standards of men and women, and Cooper standards were used and accepted

by large number of municipalities."  (Def.'s Ex. 6 at 102:11-16.)  Additionally, in his expert

report, Dr. McArdle does not cite any publications challenging Cooper's pool or its norms.  (Pls.'

Ex. 22.)

In sum, Plaintiffs cannot establish that the 1.5 mile run caused a disparate impact, and

therefore, the court should rule in favor of Defendant.

**B.      Defendant Has Demonstrated Content Validation Of The 1.5 Mile Run And
That The Test Is Job Related And Consistent With Business Necessity.**

If plaintiff proves a prima facie case of disparate impact discrimination, defendant must

"demonstrate that the challenged practice is job related for the *position in question* and consistent

with business necessity."  42 U.S.C. § 2000e-2(k)(1)(A)(i).  Plaintiffs incorrectly argue that the

relevant issue with regard to Defendant's job related/business necessity defense is "whether the

discriminatory cut scores correspond to the minimum level of physical fitness required to

perform the CO job."  (Pls.' Reply 4; Pls.' Mem. Opp. 11, 12.)  In support of this statement,

Plaintiffs cite the "minimum qualifications" standard from *Lanning v. SEPTA*, 181 F.3d 478 (3d

Cir. 1999).  The Second Circuit, however, has not adopted this standard.  Rather, in

demonstrating that a challenged practice is job related and consistent with business necessity, the

Second Circuit requires that a defendant validate a test in conformity with the EEOC Guidelines.

*See Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361 (2d Cir. 2006); *Guardians Ass'n of NYC*

*Police Dep't, Inc. v. Civil Serv. Comm'n*, 630 F.2d 79 (2d Cir. 1980), *cert. denied*, 463 U.S. 582

(1983).  Thus, Defendant is not required to show that the cut score corresponds to a minimum level of physical fitness required to perform the job.[3]

With regard to validation, Plaintiffs attempt to require Defendant to validate the physical fitness test with a criterion related validation test and ignore the fact that Defendant validated its test through content validation.  (Pls.' Mem. Opp. 11.)  Plaintiffs contend that "DOC's experts have not observed any statistically significant correlation between aerobic capacity and CO job performance."  (Pls.' Mem. Opp. 11.)  As discussed in Defendant's Memorandum in Support of its Motion for Summary Judgment, such a showing would demonstrate criterion-related validity. (Def.'s Mem. Supp. Summ. J. 18.)

Criterion validity requires "empirical data demonstrating that the selection procedure is predictive of or significantly correlated with important elements of job performance."  29 C.F.R. § 1607.5.  Defendant is not required to use criterion validity.  *See Washington v. Davis*, 426 U.S. 229, 247 n.13 (1976) ("It appears beyond doubt by now that there is no single method for appropriately validating employment tests for their relationship to job performance.").  "A review of the Uniform Guidelines and the relevant psychological literature reveals no preference for criterion-related validation."  *Gillespie v. State of Wisconsin, et al*., 771 F.2d 1035, 1040 (1985), *cert. denied*, 474 U.S. 1083 (1986).  "The principal difficulty with construct validation is that it requires a technique that includes a criterion-related study, Guidelines § 14(D)(4)-a demonstration from empirical data that the test successfully predicts job performance.

---

[3] Even applying the Third Circuit's "minimum qualifications" standard, DAS determined through job analysis surveys and content validation that the position of CO required individuals to have at least "fair" fitness because of the physical nature of the job duties as reflected by the "hazardous duty" classification of the position.  Such analysis of the cut score may be different than the validation performed in *Lanning* as that case is distinguishable because the employment practice at issue was a single standard agility test (a 12 minute run that was not age and gender normed).  With a normed test, one cut score is applied (i.e., here, the 40th percentile).  This percentile cut score represents the minimum fitness level, and more specifically the minimum aerobic capacity, for a person of a certain age and gender that DAS has determined through its professional judgment is necessary for a CO.  *See infra*.

Developing such state is difficult, and test for which it is required have frequently been declared invalid." *Guardians*, 630 F.2d 79.  Defendant can use any of the accepted validation methods – content, criterion, and construct.  *Washington*, 426 U.S. at 247; *Gulino*, 460 F.3d at 384; 29 C.F.R. § 1607.5(B).  "[I]t is reasonable to insist that the test measure important aspects of the job, at least those for which appropriate measurement is feasible, but not that it measure all aspects, regardless of significance, in their exact proportions." *Guardians*, 630 F.2d at 99.

Specifically, with regard to a cut score, an employer may establish a justifiable reason for a cut-off score by "using a professional estimate of the requisite ability levels, or, at the very least by analyzing the test results to locate a logical 'break-point' in the distribution of scores." *Id.*; *see also Bew v. City of Chicago*, 252 F.3d 891 (7th Cir. 2001); *Gillespie*, 771 F.2d at 1045. The EEOC Uniform Guidelines state that a cutoff score "should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force."  29 C.F.R. § 1607.5(H); *see also Guardians*, 630 F.2d at 105.  Thus, "[a]n employer using a test to screen job applicants must fulfill two requirements to justify the choice of a cut-off score:  The test scores must be reliable . . . and the employer must have some justifiable reasoning for adopting the cut-off score." *Gillespie*, 771 F.2d 1035, 1044-1045 (*citing Guardians*, 630 F.2d at 105).  By analogy, in disparate treatment cases, courts "must respect the employer's unfettered discretion to choose among qualified candidates . . . [and] will not act as a super personnel department that second guesses employers' business judgments." *Byrnie v. Town of Cromwell*, 243 F.3d 93, 103 (2d Cir. 2001) (citations and internal quotations omitted).

Here, through several job analyses, Defendant demonstrated content validity of the 1.5 mile run and the cut score by showing that the "behavior(s) demonstrated in the selection procedure are a representative sample of the behavior(s) of the job in question . . . ."  29 C.F.R. §

1607.14(C)(4); (Def.'s Mem. Supp. Summ. J. 20-25.)  Defendant used a reliable cut score and justifiable reason in adopting the 40% cut off based on comprehensive analysis of the physical requirements for CO's as reflected in multiple job surveys over almost a decade and the hazardous duty classification of the position.  (Def.'s Ex. 1, Attachments C-D-2.)  Unlike the defendant's decision in *Pietras v. Board of Dire Com'rs of Farmingville*, 180 F.3d 468, 474 (2d Cir. 1999), this cut score was not arbitrary.  Rather, it was based on the logical breakpoint between "fair" and "poor" aerobic fitness as reflected in nationally accepted age and gender norms.  As the law recognizes, Drs. Libby and Anderson exercised professional judgment in evaluating the reliability of the test and the cut score.[4]  *See infra.*

Defendant has demonstrated that the cut score for the 1.5 mile run is content valid and thus job related and consistent with business necessity for the position of Correction Officer.  Therefore, Defendant's Motion for Summary Judgment should be granted.

### C.    Plaintiff Cannot Establish That Defendant Refused To Adopt An Available Alternative Employment Practice That Has Less Disparate Impact And Serves Defendant's Legitimate Need.

Defendant maintains that Plaintiffs are not able to meet their burden of demonstrating that the 300 meter run test, which DAS is currently using for CO applicants in lieu of the 1.5 mile walk/run test, is a less discriminatory "alternative employment practice" that serves DOC's legitimate operational interests.  Nor can Plaintiffs demonstrate that DOC refused to adopt such test in 2004 or 2006.  Accordingly, their argument must fail, and Defendant's Motion for Summary Judgment should be granted.

---

[4] Although discussing the criterion validation, Dr. Goldstein, Plaintiff's expert, testified that in designing a test one would use a "reasonable estimate scientifically . . . [b]ut you're always making some kind of judgment in the end." (Def's Ex. 5 at 6:12; 56: 15-16)

As the U.S. Supreme Court recently noted, even if an employer meets its burden of demonstrating that the challenged practice is job related for the position in question and consistent with business necessity, "a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practices that has less disparate impact and serves the employer's legitimate needs." *Ricci v DeStefano*, 129 S.Ct. 2658 (2009). In *Wards Cove,* the Court stated that "[o]f course, any alternative practices which respondents offer up in this respect must be equally effective as petitioners' chosen hiring procedures in achieving petitioner's legitimate employment goals." 490 U.S. at 661.

All of the experts, including Plaintiffs' experts Dr. McArdle and Dr. Goldstein, admit that the 300 meter run tests for anaerobic fitness and the 1.5 mile run tests for aerobic fitness. Dr. Goldstein stated that the 300 meter run test is "commonly used as a measure of *anaerobic* ability." (Pls.' Ex. 15, Report of Harold Goldstein, p. 15.) Goldstein admits that "you may lose prediction of certain aerobic capabilities by removing the 1.5 mile test." *Id.* He stated, "I'm not trying to state that . . . the 300 meter run test is a test of aerobic capacity." (Def.'s Ex. 5, Harold Goldstein deposition, p. 107.) He further admits that he did not conduct a validation study of the 300 meter run test, and the fact that it is a "commonly used" test does not mean that it is a valid test. (Def.'s Ex. 5, p. 109-10.) Plaintiff's expert Dr. McArdle admits that he 300 meter run tests for anaerobic capacity as opposed to aerobic capacity. (Def.'s Ex. 6, Deposition of William McArdle, p. 79.)

Plaintiffs again claim the 300 meter test is more predictive of the job of Correction Officer. (Pls.' Mem. Opp. 15.) But once again, Plaintiffs are using a criterion validation standard. Defendant properly identified an aerobic capacity element to the position of Correction Officer based on the repeated job analyses done for the position of Correction Officer. (Ex. 1,

Affidavit of Pamela Libby, ¶'s 4-12, Attachments C—D-2.)  Unless it can be said that there is no aerobic capacity required of a Correction Officer to do his or her job and the State of Connecticut was unreasonable in finding that there was an aerobic capacity element to the position of Correction officer, this Court should not sit as a super personnel department as discussed *supra*.

Plaintiffs also argue that once Defendant knew there was adverse impact in the 1.5 mile run and did not change the 1.5 run in 2004, that decision amounts to a refusal to adopt a less discriminatory alternative.  (Pls.' Mem. Opp. 15.)  Plaintiffs have cited to no case law to support their position that the State of Connecticut's failure to adopt the 300 meter run in 2004 is equivalent to a refusal to adopt a less discriminatory alternative under the law.

As stated in its Memorandum in Support of its Motion for Summary Judgment, Defendant did not implement the 300 meter run because it did not believe it was an adequate alternative.  Additionally, based on the history of the 1.5 mile run, the test did not result in a disparate impact on the candidate pool as a whole.  (Def.'s Mem. Supp. Summ. J. 12-13.)  When looking at the result of the CO applicants, the State attempted to determine why individuals were failing by issuing a survey to all the candidates who took the 2004 physical fitness test.  (Def.'s Ex. 1, Libby Affidavit, ¶'s 24-28, Attachment K.)  Based on the survey results, DAS aggressively supplied more information about how to prepare for the physical fitness test on its website, held informational sessions, and gave candidates an option of making up the test if they failed.  (*Id.* ¶'s 33-36; Pls.'s Exs. 10-12.)  The State was attempting to resolve the problem with the 1.5 mile run for COs by means other than stopping the 1.5 mile run without more information.  Further, Defendant was not aware of the purported atypicality of Cooper's applicant pool.  Many municipalities used Cooper norms in testing, the DOJ endorsed the use of

the Cooper standards, and Defendant was not aware of any publications challenging Cooper's pool or its norms.   (Def.'s Exs. 9, 10.)

Consequently, Plaintiffs are unable to demonstrate that the 300 meter run is a less discriminatory alternative or that DAS refused to implement the 300 meter run in lieu of the 1.5 walk/run in 2004 or 2006.  As such, Defendant's Motion for Summary Judgment should be granted.

**D.    Defendant May Rely on Dr. Libby's Affidavit Because She Is Competent To Testify As To The Facts And Numerous Documents Attached To Her Affidavit Support Her Factual Statements.**

In the Introduction section of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, Plaintiffs claim that "[i]n support of its motion, DOC relies nearly exclusively on Dr. Pamela Libby's Affidavit of November 4, 2010 . . . . Libby's affidavit is riddled with conclusory opinions with virtually no evidence to support her assertions."  (Pls.' Mem. Opp. 1; Pls.' Reply 8.)  The Federal Rules of Civil Procedure, the Local Rules of this Court, and Court rulings support the use of affidavits in support of Motions for Summary Judgment.  "Under the familiar summary – judgment standard, summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law' Fed. R. Civ. P. 56(c)(2)."  *Imaginative Research Assoc. Inc., v. Ramierez*, 2010 U.S. Dist. LEXIS 56155, at *2 n.1 (D. Conn. June 8, 2010).   The Local Rules of the Connecticut District Court provide that "[e]ach statement of material fact by a movant in a Local Rule 56(a)1 Statement . . . must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial. . ."  Local Rule 56(a)(3).

Dr. Pamela Libby is more than competent to testify as to the facts submitted in her affidavit.  Additionally, numerous documents in support of her factual statements were attached to her affidavit.   Plaintiffs' claim that Dr. Libby's "affidavit is riddled with conclusory opinions with virtually no evidence to support her assertions" is not supported by the evidence. Furthermore, nowhere in the Plaintiffs' Local Rule 56(a)2 Statement do the plaintiffs claim that the a factual allegation in Defendant's Local Rule 56(a)1 Statement is a conclusory allegation not supported by the evidence.

### E.   Drs. Libby and Anderson Are Qualified To Offer Expert Testimony On Job Relatedness/Business Necessity And Less Discriminatory Alternatives.

In section IV of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, Plaintiffs claim that Dr. Pamela Libby and Dr. Martin Anderson are not qualified to be expert witnesses on the issues of job relatedness and business necessity of the 1.5 mile run and the 300 meter test as a less discriminatory alternative.  (Pls. Opp. 16-19.)  Defendant maintains that Dr. Libby and Dr. Anderson are qualified to be experts on the issue of job relatedness and business necessity of the 1.5 mile run and the 300 meter test as a less discriminatory alternative.

Rule 702 of the Federal Rule of Evidence provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Dr. Pamela Libby has a Ph.D. in Social and Industrial Organizational Psychology from Rutgers University, which she received in 1985.  (Def.'s Ex. 1, Affidavit of Pamela Libby, Attachment L, Addendum B, resume of Pamela Libby, Ph.D.) Dr. Pamela Libby has been involved in developing personnel testing and validations of personnel testing since 1984.  *Id.*  Dr. Martin

Anderson has a Ph.D in Applied Behavioral Studies in Education (School Psychology and Psychometry) that he received from Oklahoma State University in 1986. (Def.'s Ex. 1, Affidavit of Pamela Libby, Attachment L, Addendum C, resume of Martin W. Anderson, Ph.D.) Dr. Anderson has been involved in developing personnel testing and validation of personnel testing since 1984. *Id.* Dr. Anderson's resume indicates that he has served as an expert witness on employee selection, adverse impact, disparate treatment or testing matters in Federal District Courts and Connecticut State Court. *Id.* Dr. Libby and Dr. Anderson clearly are experts by knowledge, skill, experience, training, and/or education in personnel testing and validation, which would include knowledge, skill, experience, training and education with validation of personnel testing as it relates to job relatedness and business necessity and less discriminatory alternatives.

Dr. Libby and Dr. Anderson also have demonstrated that (1) their testimony is based upon sufficient facts or data, (2) their testimony is the product of reliable principles and methods, and (3) they have applied the principles and methods reliably to the facts of the case. In fact, the documents submitted with Dr. Libby's Affidavit, (Ex. 1, Attachments B-F), and Dr. Anderson's deposition, (Ex. 3), demonstrate their expertise in content validation of personnel testing.

Plaintiffs also claim in their Memorandum in Opposition that Drs. Anderson and Libby are not exercise physiologists. (Pls.' Mem. Opp. 16.) However, there is no requirement that they are exercise physiologists in order to offer expert testimony on the issue of the business necessity or the job relatedness of the 1.5 mile run used by the State of Connecticut or to testify on the issue of whether the 300 meter run a less discriminatory alternative to the 1.5 mile run. The Report on the Selection and Use of the Physical Fitness Test for Connecticut Correction Officer created by Dr. Martin Anderson and Dr. Pamela Libby, (Def.'s Ex. 1. Attachment L, Addendum

A), uses content validation to support its conclusion that the physical fitness test for Correction Officers meets both the practical and legal standards of job relatedness and business necessity. Dr. Anderson and Dr. Libby are also competent to testify on the use of the 300 meter test as an alternative for the 1.5 mile run as discussed in Exhibit 1, Attachment M, Addendum A, Report to Answer the Question: Is the 300 Meter Run a Less Discriminatory Alternate to the 1.5 Mile Run for Screening Correction Officers.

It is apparent that Plaintiffs keep attempting to discredit Defendant's experts by ignoring content validation and limiting this court to a criterion method of validation.  Plaintiffs state in their Memorandum in Opposition that  "Drs. Libby and Anderson fail to address Plaintiffs' exercise physiologist's conclusion that the 300 meter run test is, in fact, a *better* predictor of job performance than the 1.5 mile run test." (Pls. Opp. 17.)  There is no requirement that Defendant use criterion validation, which involves a prediction of job performance.  *See Guardians Ass'n of NYC Police Dep't, Inc. v. Civil Serv. Com'n*, 630 F.2d 79, 92 (2d Cir. 1980), *cert. denied*, 452 U.S. 940 (1981).

Plaintiffs cite to cases in which the expert had no experience with the particular product or the expert had not performed similar analysis. (Pls.' Opp. 19.)  Dr. Libby and Dr. Anderson both have been involved in developing personnel testing and validations of personnel testing for over 25 years.  The expert report prepared by Dr. Libby and Dr. Anderson, along with the Attachments of the job analysis submitted with Dr. Libby's affidavit, and Dr. Anderson's deposition as provide in Defendant's Exhibit 2, demonstrate that (1) their testimony is based upon sufficient facts or data, (2) their testimony is the product of reliable principles and methods, i.e., content validation, and (3) they applied content validation principles and methods reliably to

the facts of the case.  Accordingly, Plaintiff's claim that Drs. Anderson and Libby are not

properly qualified expert witnesses must be rejected.


## **CONCLUSION**

For all of the foregoing reasons, Defendant respectfully requests that the court grant its

Motion for Summary Judgment.


DEFENDANT


RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:_/s/ Maria C. Rodriguez_____
Maria C. Rodriguez (ct08946)
Margaret Q. Chapple (ct05550)
Assistant Attorneys General
Eleanor R. Farrell (Legal Intern)
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel.:  (860) 808-5340
Fax:  (860) 808-5383
E-mail:  Mariac.Rodriguez@ct.gov
 Margaret.Chapple@ct.gov

## CERTIFICATION

I hereby certify that on April 18, 2011 a copy of the foregoing Reply Brief was filed

electronically.  Notice of this filing was sent by e-mail to all parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.

Maria C. Rodriguez_____
Maria C. Rodriguez (# ct08946)
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT  06141-0120
Tel.: (860) 808-5340
Fax: (860) 808-5383
E-mail: Mariac.Rodriguez@ct.gov
