UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHERIE EASTERLING, individually and on behalf of all others similarly situated : : : Plaintiffs, : v. : : STATE OF CONNECTICUT : DEPARTMENT OF CORRECTION. : : Defendant. : : | CLASS ACTION COMPLAINT CIVIL ACTION NO. 08 CV 826 (JCH)  July 23, 2013 |

**DECLARATION OF CYRUS E. DUGGER IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND APPROVAL OF THE PROPOSED NOTICE OF SETTLEMENT <u>AND CLASS ACTION SETTLEMENT PROCEDURE</u>**

I, Cyrus E. Dugger, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an associate at the firm of Outten & Golden LLP ("O&G") in New York, New York, which, together with Public Citizen Litigation Group ("PCLG"), 1600 20th Street, NW, Washington, DC 20009, are Class Counsel herein. O&G is a 30+ attorney firm based in New York City that represents plaintiffs in a wide variety of employment matters, including individual and class action litigation involving wage and hour, discrimination, and harassment claims, as well as contract and severance negotiations.

2. I have been one of the lawyers primarily responsible for the prosecution of the claims in this matter.

3. I make these statements based on personal knowledge and would so testify if called as a witness at trial.

4. On July 19, 2013, Defendant's counsel reviewed Plaintiff's Unopposed Motion

for Preliminary Approval and Approval of the Proposed Notice of Settlement and Class Action Settlement Procedure ("Motion for Preliminary Approval"), and confirmed that they did not oppose the motion.

5. On July 23, 2013, Defendant's counsel reviewed and approved several additional minor modifications to the submissions.

**Procedural History**

6. On April 20, 2005, Plaintiff Easterling filed a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CCHRO"). After she received a notice of right to sue, Plaintiff Easterling commenced this litigation against the Connecticut Department of Correction on May 30, 2008, alleging that the physical fitness test applied to applicants for the Correction Office position resulted in a disparate impact on female applicants in violation of Title VII of the Civil Rights Act.

7. On January 4, 2010, the Court granted Plaintiff's Motion for Class Certification, pursuant to Fed. R. Civ. P. 23(b)(2).

8. On May 5, 2011, the Court granted Plaintiff's Motion for Summary Judgment as to liability for disparate impact discrimination because of Defendant's use of the 1.5 mile portion of the physical fitness test.

9. On November 22, 2011, the Court modified its earlier certification order, certifying Plaintiff's claims for class-wide declaratory and injunctive relief pursuant to Fed. R. Civ. P. 23(b)(2), and Plaintiff's claims for monetary and individualized injunctive relief pursuant to Fed. R. Civ. P. 23(b)(3). The Court held that the members of the class include "[a]ll female applicants for the position of Correction Officer ("CO") at the State of Connecticut Department of Correction ("DOC") who participated in the CO selection process and failed only the 1.5 mile run portion of the physical fitness test at any time from June 28, 2004, and continuing to the date

of final judgment in this matter." *Easterling v. Conn. Dep't of Corr. ("Easterling III")*, 278 F.R.D. 41, 51 (D. Conn. 2011).

10. On January 3, 2012, following briefing, the Court approved the form of notice and opt-out form for the class. ECF No. 166. The Court then set the schedule for the remedial damages phase of litigation on January 19, 2012. ECF No. 172. Only one class member, Virginia C. Brennan, opted out of the class. ECF No. 173.

11. On March 27, 2012, the parties filed a Joint Stipulation, pursuant to which the defendant agreed to grant priority hiring status to otherwise qualified class members who successfully completed the 2012 Correction Officer selection process. ECF No. 187. The Joint Stipulation did not provide for retroactive seniority or other individualized relief for the class.

12. Following the Court's November 22, 2011 decision denying Defendant's motion to decertify the class, the parties engaged in extensive settlement negotiations as to post-liability relief.

13. After the parties reached an impasse, and in furtherance of their ongoing negotiations, they submitted two critical issues concerning gross class back pay to the Court for resolution: (1) the number of class members who would have been hired in the absence of discrimination (the "hiring shortfall"); and (2) the period of time for which class members would be eligible for back pay ("Damages Period"). ECF Nos. 182, 189, 197, 205, 208.

14. The Court resolved these questions on June 27, 2012. ECF No. 213. The Court determined that for class members who first took the physical fitness test in 2004, the back pay period began on the average date of appointment for successful candidates from the 2004 application cycle, and that for class members who took the test in 2006, the back pay period began on the average date of the appointment for successful candidates from the 2006 application cycle. The Court also held that the back pay period terminated on the average date of

appointment for class members who successfully completed the 2012 application cycle pursuant to the parties' 2012 priority hiring agreement.

15. The Court also resolved the correct methodology for calculation of the shortfall value. The Court determined that "the hiring shortfall analysis in this case will assume that class members would have satisfied post-physical fitness test hiring criteria at the same rate as other applicants." ECF No. 213 at 9. Following this ruling, the parties agreed that the proper hiring shortfall number was 28.

16. The parties thereafter continued settlement negotiations with the assistance of Judge Fitzsimmons, including in-person mediations and telephonic conferences, as well as numerous additional settlement discussions directly between the parties.

**Discovery**

17. The parties engaged in significant discovery before agreeing to resolve this case.

18. Plaintiff served four sets of documents requests, totaling 47 specific requests over the course of the litigation. Plaintiff also served two sets of interrogatories totaling 11 separate interrogatories.

19. The parties engaged in vigorous litigation and discovery prior to the Court's order finding liability. Prior to the finding of liability: (1) the parties conducted six pre-liability depositions (including expert depositions); (2) Defendant unsuccessfully moved to dismiss; and (3) the parties submitted cross-motions for summary judgment as to liability.

20. In addition, during the post-liability remedial phase of the litigation, Defendant served class discovery requests regarding all potential defenses to individualized relief (*i.e.* back pay, instatement, and/or front pay relief). Specifically, Defendant served 35 interrogatories and 12 document requests on all 124 class members. Although Plaintiff did not formally produce this discovery to Defendant in its entirety prior to the parties agreeing to a stay of discovery,

4

pursuant to the parties' settlement negotiations, Plaintiff ultimately provided the majority of the information Defendant sought informally.

21. Specifically, in response to the request for class discovery, Class Counsel obtained comprehensive information, from 2004 to the present, regarding class members' income, job history, current eligibility for the CO position, and additional potentially relevant information. This information was obtained through: (1) detailed interviews of almost 100 class members (many of which were in-person home visits); and (2) collecting SSA and IRS authorization forms. These authorizations eventually provided Class Counsel with detailed salary and employment information from the IRS and SSA for 97 class members. As noted above, the majority of this information was eventually shared with Defendant's counsel in the context of the parties' settlement discussions.

22. Plaintiff also obtained extensive information regarding Defendant's potential defenses to instatement and/or front pay relief. Plaintiff served two sets of documents requests and one set of interrogatories concerning post-liability defenses to individual back pay, instatement, and/or front pay relief.

23. All told, Plaintiff served a total of 11 interrogatories and 47 document requests throughout the course of the litigation.

24. Class Counsel also conducted a Fed. R. Civ. P. 30(b)(6) deposition concerning Defendant's application processes following passage of the 1.5 mile run test at issue in this lawsuit.

25. Class Counsel is only aware of a handful of Title VII class actions that have progressed to litigation in the remedial damages phase. Yet, Defendant nonetheless vigorously contested the remedial damages phase in this action.

**Settlement Negotiations**

26. The parties engaged in extensive settlement negotiations as to post-liability relief following the Court's November 22, 2011 decision denying Defendant's motion to decertify the class.

27. As noted above, after reaching an impasse in their negotiations, the parties submitted two critical issues concerning gross class back pay to the Court for resolution: (1) the number of class members who would have been hired in the absence of discrimination (the "hiring shortfall"); and (2) the period of time for which class members would be eligible for back pay ("Damages Period"). ECF Nos. 182, 189, 197, 205, 208. The Court resolved both of these questions for the parties on June 27, 2012.

28. Following resolution of these issues, the parties continued settlement negotiations regarding the settlement of gross back pay relief, priority hiring, and additional class benefits. These negotiations consisted of in-person mediations and telephonic conferences with Judge Fitzsimmons, as well as numerous additional discussions directly between the parties. During these negotiations the parties agreed to November 2, 2012, the first Correction Officer hiring date for 2012, as the back pay damages cut-off date because the DOC offered a sufficient number of Correction Officer positions to class members on that date. The parties also agreed that the hiring shortfall number would be 28.

29. With the assistance of Judge Fitzsimmons, the parties tentatively agreed to settlement of gross back pay with an approximate value of $1,851,892 during January 2013. This value was reached as a compromise, given both Defendant's potential affirmative defenses, as well as Class Counsel's continuing accrual of fees. Shortly thereafter, the parties reached agreement on the additional aspects of the benefits that would accrue to the class. All of these

agreements were further developed and finalized on May 3, 2013, when the proposed agreement was submitted to the Connecticut General Assembly.

30. After resolving the gross back pay and the benefits that would accrue to class members, the parties began a second and separate negotiation regarding the resolution of attorney's fees and costs. At the request of the parties, and after accepting detailed submissions from both parties, Judge Fitzsimmons resolved this remaining issue on April 23, 2013. Specifically, following these submissions, Judge Fitzsimmons recommended settlement of Plaintiff's attorneys' fees and costs in the amount of $1,232,463.[1]

31. The parties had agreed in advance to accept Judge Fitzsimmons' recommendation, that Plaintiff would submit the recommended value to the Court for approval, and that Defendant would not oppose Plaintiff's motion.

32. On May 3, 2013, Defendant's counsel submitted the final Stipulated Agreement, setting forth the final terms of all aspects of the agreement, to the Connecticut General Assembly, in accordance with the provisions of Conn. Gen. Stat. §3-125a. The General Assembly did not vote to approve or reject the settlement and it was thus deemed approved thirty days after the submittal.

33. Plaintiff Cherie Easterling has indicated to Class Counsel that she supports approval of the settlement.

---

[1] Class Counsel will share $40,000 of their attorneys' fee award with the Law Offices of Jamie L. Mills pursuant to an agreement between the firms. The Law Offices of Jamie L. Mills provided assistance in the early phase of the case and Class Counsel is not seeking any additional fees or costs for their work.

34. The vast majority, if not all, class members with whom Class Counsel has discussed the status of settlement, have expressed their desire to receive the benefits of settlement as soon as possible instead of continuing the litigation.

**Class Outreach**

35. Class Counsel also made extraordinary efforts to locate and contact class members (many of whom Defendant did not have current contact information for), including, but not limited to use of: (1) electronic databases; (2) a private investigator; and (3) a contract attorney to conduct home visits for class members that were otherwise unreachable. These efforts led to communication with approximately 80% of class members, an extraordinary percentage for a Title VII class action.

36. Class Counsel also conducted two in-depth class meetings in Connecticut during early June 2012. Class Counsel spent considerable time explaining the nature of the class claims, explaining the procedural posture of the case, and answering a wide range of questions from class members regarding the potential scope of relief. These meetings resulted in many class members having a particularly detailed understanding of their claims. These meetings also provided Class Counsel with detailed insight into the views, opinions, and expectations of the class as to the various available forms of remedial relief.

37. Class Counsel has also made or received more than a thousand class member telephone calls.

38. Class Counsel believes that, as a result of these extensive class contacts, Class Counsel is especially well-equipped to evaluate the strengths and weaknesses of class members' claims and defenses, and also particularly well-positioned to represent that the class will respond favorably to the proposed settlement.

39. In fact, based on Class Counsel's communications with the class over the course of the last year, Class Counsel believes that most class members expect to receive less than $15,000 in back pay, which will be the average amount of the award if all 124 class members remain in the class.

**Incentive Award**

40. Plaintiff Easterling intends to submit a separate motion requesting an incentive award of up to $10,000.

**Claims Process**

41. In addition to the elements of the claims process set forth in the Stipulated Agreement, that Agreement provides that Class Counsel shall propose a methodology for the pro rata distribution of back pay to class members. Plaintiff seeks approval of the following steps for the claims process:

1. Class members who have submitted complete IRS and SSA authorization forms and who do not opt out will receive back pay awards.

2. Class members who have not submitted IRS and SSA authorization forms will receive the required forms.

3. If a class member submits incomplete SSA or IRS authorization(s), Class Counsel will send a letter to the class member explaining the reason that the authorization is incomplete within five days, after which the class member will have fourteen days from the mailing to submit the corrected authorization(s) to Class Counsel via facsimile (or submit by mail by the original deadline if that deadline provides more time).

4. Class members will be divided into two groups based on whether they first applied to the Correction Officer position in 2004 or 2006.

5. Using the information obtained for each class member from the IRS and SSA, Class Counsel will calculate the difference in wages for each class member as compared to the Correction Officer position (as valued in damages Tables 2 and 3 of the Stipulated Agreement) during the Damages Period. This value will

represent the back pay value each class member would have been entitled to prior to a pro rata reduction reflecting the gross class damages methodology.[2]

6. The total difference in wages between each class member and the Correction Officer position during the Damages Periods will be separately totaled for 2004 and 2006 applicants. Class members whose actual wages were more than the wages they would have received as a Correction Officer during their Damages Period will have a value of zero for this step.

7. For each group (*i.e.* 2004 and 2006 applicants) the gross class damages attributed to that applicant group in damages Table 1 ($565,474 for 2004 and $1,286,418 for 2006)[3] will be divided by the total income difference for all participating class members for each respective group derived from the totals of step #6.

8. The resulting proportional value for the 2004 applicants and 2006 applicants will be applied to the value calculated for each class member in step #5, which will determine that class member's appropriate pro rata distribution (the 2004 and 2006 applicant groups will have different proportional values).

In addition, Plaintiff seeks approval of the following specific procedures:

1. Following preliminary approval, and prior to mailing notice, Class Counsel will run a search for any new addresses for each class member reported since January 1, 2012, on Westlaw People Search.

2. On August 2, 2013, Class Counsel will mail the notices to class members (class members for whom Class Counsel has not received SSA and IRS authorization forms will also receive the required forms and a pre-paid envelope for delivery to Class Counsel), at their last known address, as well as any additional addresses provided by Westlaw People Search, for the period after January 1, 2012. Class members for whom Class Counsel have received completed IRS and SSA

---

[2] Where the information provided by the IRS and SSA differ for a given year, the values will be averaged. Where only one agency provides information in response to Class Counsel's submission of complete authorization forms for a given year, Class Counsel will base its calculations on only the information provided by the disbursement deadline. In instances where an authorization was submitted to Class Counsel, but became stale before submission to the IRS or SSA, Class Counsel will rely on the information received as of the time of disbursement of awards, but prior to such reliance, will also request an additional authorization from the class member and submit it to the relevant agency.

[3] The 2004 and 2006 totals will each be reduced by half of any incentive payment awarded to Cherie Easterling from the gross class damages fund. The maximum such award permitted by the Stipulated Agreement is $10,000.

authorization forms will receive the notice attached to the Dugger Decl. as Ex. C, and class members for whom Class Counsel has not received completed authorizations will receive the notice attached to the Dugger Decl. as Ex. D.

3. Class members will have until September 3, 2013, to opt out of or object to the settlement ("Notice Period").

4. A final fairness hearing will occur on September 10, 2013 at 2:00 pm.

5. Plaintiff will file a Motion for Final Settlement Approval and Motion for Approval of Attorney's Fees and Costs and Incentive Award by September 6, 2013.

6. After the fairness hearing, if the Court grants Plaintiff's Motion for Approval of Settlement, the Court will issue a Final Order and Judgment. If no party objects to the proposed settlement, the "Effective Date" of the settlement will be the day the Court enters its Final Order and Judgment.

7. If an individual or party object to and appeals the Court's Final Order and Judgment, the "Effective Date" of the settlement shall be the day after all appeals are finally resolved in favor of final approval and the time for any further appeal, rehearing, or reconsideration has expired.

8. Class Counsel will mail class members a copy of the Final Order and Judgment and the pension credit request form, Dugger Decl., Ex. E (Pension Credit Request Form), within seven days of the Effective Date of settlement. Following approval of the settlement, Class Counsel will also send a short follow-up notice, to be agreed to by both parties, and ultimately approved by the Court at the fairness hearing, containing the final deadline for submitting SSA and IRS authorizations (to class members that have failed to submit them), and any other information agreed to by the parties.

9. Defendant will disburse one check in the amount of $1,851,892 (gross back pay relief) and one check in the amount of $1,232,463 (attorney's fees and costs) to Class Counsel within thirty days of the Effective Date of settlement.

10. Back pay award checks will be mailed to class members one hundred and fifty days after the Effective Date of the settlement. If, after Class Counsel submits the IRS and SSA authorization forms, it does not receive SSA and/or IRS information from the respective agencies (for any given class member in any given year) within one hundred and thirty-five days of the Effective Date of settlement, Class Counsel will designate that year a value of $10,000 in wages with respect to the class member's wages/damages calculations.

11. Class Counsel will deduct the amount of outstanding liens due and owing to the State of Connecticut from the disbursement made to each class member who is subject to such lien(s) and remit those funds to the State at the time the disbursement check is sent to the class member. Defendant's counsel will provide Class Counsel with a list of such outstanding liens.

12. Funds that remain undisbursed because class members do not cash their back pay award checks within ninety days of receipt (as required under the Stipulated Agreement) will be disbursed to the class members who deposited checks within the required ninety days. This second distribution of the remaining funds will be apportioned equally, to all class members who deposited their checks within the deadline, and will be disbursed sixty days after the latest deadline for all class members to have deposited their back pay award check.

**Damages Calculations**

42. The parties agreed upon damages calculations are discussed in detail in the damages Tables attached to the Stipulated Agreement. In agreeing to settle gross back pay without applying reductions for mitigation defenses, Defendant made a reasonable concession in the interests of settlement, and did so as an alternative to the accrual of additional fees.

43. Absent this concession, each class member's back pay award was subject to potential substantial reductions following individualized *Teamsters* hearings because of: (1) an attack on the scope of each class member's mitigation efforts; and/or (2) Defendant's potential ability to establish that a class members would have been disqualified from the CO position in 2004 or 2006 for an alternative lawful reason.

44. The $1,851,892 settlement of back pay, as well as the hiring processes and additional benefits, represent a good value given the risks of continued litigation. Class Counsel believes that the back pay settlement represents a significant percentage of the recovery that Plaintiff and the class would have achieved if they succeeded on all claims at trial and survived an appeal. Members of the class will receive close to the maximum value for their claims because they will not be subject to reduction by mitigation defenses. The primary discount to the

gross class damages award has been: (1) an agreement to accept a slight reduction in value to reflect potential of unemployment benefits; and (2) removal of the value of pension benefits from back pay and substitution of pension credits.

**Exhibits**

45. A true and correct copy of the complaint filed in this action May 30, 2008 is attached hereto as **Exhibit A**.

46. A true and correct copy of the May 3, 2013 Stipulated Agreement between Defendant and Plaintiff is attached hereto as **Exhibit B**.

47. A true and correct copy of the version of the notice that will be sent to class members for whom Class Counsel has received IRS and SSA authorizations is attached hereto as **Exhibit C**.

48. A true and correct copy of the version of the notice that will be sent to class members for whom Class Counsel has not received IRS and SSA authorization is attached hereto as **Exhibit D**.

49. A true and correct copy of the Pension Credit Form class members must fill out to receive pension credit, and which will be sent to class members following final approval of settlement, is attached hereto as **Exhibit E**.

50. A true and correct copy of Plaintiff's Proposed Order Approving Settlement is attached hereto as **Exhibit F**.

51. A true and correct copy of the Court's decision in *Easterling v. Conn. Dep't of Corr.*, No. 08 CV 826 (D. Conn. June 27, 2012), resolving the temporal period of gross class damages relief and the hiring shortfall calculation, is attached hereto as **Exhibit G**.

Dated  July 23, 2013
      New York, New York

      Respectfully submitted,

      **OUTTEN & GOLDEN LLP**


      By: /s/ Cyrus E. Dugger
          Cyrus E. Dugger

      **OUTTEN & GOLDEN LLP**
      3 Park Avenue, 29th Floor
      New York, New York 10016
      Telephone: (212) 245-1000
      Facsimile: (646) 509-2060
      Email: cdugger@outtengolden.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2013, a copy of the foregoing was filed electronically or served by certified mail to anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by certified mail for anyone unable to accept electronic filing. The parties may access this filing through the Court's system.

/s/ *Adam T. Klein*