# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHERIE EASTERLING, individually | : | CIVIL ACTION NO. |
| and on behalf of all others | : | 3:08-CV-826 (JCH) |
| similarly situated | | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT, | : | |
| DEPARTMENT OF CORRECTION | : | May 3, 2013 |
| | | |
| Defendant. | : | |

**STIPULATED AGREEMENT**

I.     **BACKGROUND**

1.      This Stipulated Agreement (hereinafter "Agreement") is made and entered into by the parties in order to completely and fully resolve the claims made, or that could have been made, in a civil action entitled *Cherie Easterling, et al. v. State of Connecticut, Department of Correction*, No. 3:08-CV-826 (JCH) ("Easterling Litigation").

2.      On May 30, 2008, Plaintiff Cherie Easterling commenced the above-referenced litigation against the Connecticut Department of Correction.  (ECF No. 1)  Plaintiff Cherie Easterling ("Plaintiff") alleged that the physical fitness test applied to applicants for the Correction Officer position resulted in a disparate impact on female applicants in violation of Title VII.

3.      On January 4, 2010, the Court granted Plaintiff Easterling's Motion For Class Certification pursuant to Fed. R. Civ. P. 23(b)(2).  (ECF No. 75)

4.      On May 5, 2011, the Court granted Plaintiffs' motion for summary judgment as to liability for disparate impact discrimination, with respect to the 1.5 mile portion of the physical fitness test (ECF No. 133).

5.      On November 22, 2011, the Court modified its earlier certification Order and certified Plaintiffs' claims for class-wide declaratory and injunctive relief pursuant to Fed. R. Civ. P. 23(b)(2), and Plaintiffs' claims for monetary and individualized injunctive relief pursuant to Fed. R. Civ. P. 23(b)(3).  (ECF No. 156)  The Court held that the members of the class include "[a]ll female applicants for the position of Correction Officer ("CO") at the State of Connecticut Department of Correction ("DOC") who participated in the CO selection process and failed only the 1.5 mile run portion of the physical fitness test at any time from June 28, 2004 and continuing to the date of final judgment in this matter."  (*Id.* at 17)  The Court noted that, "as a

practical matter, given the defendant's abandonment of the 1.5 mile test at issue in 2007, the last day on which the test was used is effectively the end date for the class." (*Id.*)

6.     The parties to this Agreement agree and represent that the Agreement is fair, reasonable, and adequate to protect the interests of the class in accordance with Federal Rule of Civil Procedure 23.

7.     This Agreement is not to be construed as a Consent Judgment or as adjudication on the merits of this litigation.  Although the Court found Defendant liable for disparate impact discrimination in violation of Title VII, it did not reach a final determination on the exact scope of relief to which the class, or any specific individual, was entitled.  The Defendant continues to deny the allegations as to both liability and damages, and enters into this negotiated agreement as a reasonable alternative to further litigation, including an appeal of the Court's class certification and summary judgment decisions.  As a result, by entering into this Agreement, Defendant does not concede that its past policies and practices, or the past policies and practices of any agency of the State of Connecticut, violate any state or federal laws or regulations, or were otherwise inadequate.

8.     The parties agree that they will seek approval of the terms of this Agreement by the Court, and will employ every reasonable effort to obtain approval by the Court of this Agreement.  This Agreement is binding on Plaintiffs, on all class members who have not formally opted out of the class in writing, on the Defendant, and on the Defendant's successors in office, employees, and agents.  Except as otherwise provided, the parties, shall be obligated to perform the terms and conditions of this Agreement upon:

a.     Defendant receiving approval from the Connecticut General Assembly pursuant to the provisions of Conn. Gen. Stat. §3-125a; and

b.     The filing of an Order of the District Court:

    i.   incorporating and approving this Agreement; and

    ii.  approving the Agreement pursuant to Federal Rule of Civil Procedure 23 and

        all other Federal Rules applicable to class actions (hereafter "Order on

        Stipulated Agreement").

## II.     DEFINITIONS

9.     "Agreement" is defined herein as the instant Stipulated Agreement dated May 3, 2013.

10.    "Damages Period" is defined herein as the time period beginning with a class member's Presumptive Hire Date (as defined below) and ending on November 2, 2012.

11.    "Defendant" is defined herein as the State of Connecticut Department of Correction.

12.    "Defendant's Counsel" is defined herein as the Connecticut Office of the Attorney General.

13.    "Effective Date" is defined herein as the date of the filing of the Court's final approval of this Agreement.

14.    "Laws of the State of Connecticut" are defined herein as state constitutional provisions, statutes, judicial decisions, Rules of Court as promulgated by or issuing from the State of Connecticut judicial, executive or legislative branches, and regulations of administrative agencies.

15.    "Plaintiff" is defined herein as Plaintiff Cherie Easterling.

16.    "Plaintiffs" or "the Class" is defined herein as "[a]ll female applicants for the position of Correction Officer ("CO") at the State of Connecticut Department of Correction

("DOC") who participated in the CO selection process and failed only the 1.5 mile run portion of the physical fitness test at any time from June 28, 2004 and continuing to the date of final judgment in this matter."

17.     "Plaintiffs' Counsel" or "Class Counsel" are herein defined as Outten & Golden LLC and Public Citizen Litigation Group.

18.     "Presumptive Hire Date" for class members who failed the 2004 physical fitness test is October 9, 2005, and December 11, 2006 for class members who failed the 2006 physical fitness test.

## III.   GENERAL PROVISIONS

19.     Nothing in this Agreement shall require or permit the Defendant to violate the laws of the State of Connecticut or any collective bargaining agreements to which the State of Connecticut is or becomes a party.  In the event that the Laws of the State of Connecticut are potentially in conflict with this Agreement, Defendant will make every reasonable effort to simultaneously comply with this Agreement and the Laws of the State of Connecticut.  The Defendant represents that at the present time it is not aware of any conflict between this Agreement and the Laws of the State of Connecticut or any presently existing collective bargaining agreements to which the State is a party.  If, in the future, there arises a conflict between the Defendant's obligations under this Agreement and any Laws of the State of Connecticut, the Defendant may follow the laws of the State of Connecticut, and they shall promptly notify Plaintiffs' Counsel of the perceived conflict.  In the event that Defendant, due to such a claimed conflict, ceases compliance with any provision of this Agreement, Plaintiffs may seek to enforce this Agreement or may seek reformation of the Agreement in order to effectuate its underlying purposes.  Prior to instituting any such enforcement or reformation action,

Plaintiffs' Counsel shall notify the Defendant, and the parties shall meet and confer with the Court.  In such instance, the Defendant shall continue in full compliance with all provisions of this Agreement that are not affected by the purportedly conflicting Law.  Resolution of Defendant's claim of a conflict between the Laws of the State of Connecticut and this Agreement shall be resolved by the Court.

20.     This Agreement is the result of lengthy and careful negotiations among all the parties.  It has been agreed upon and entered into in order to bring an end to continued litigation and to spare the parties the expense, time, and risks of additional protracted litigation on those claims.  The Agreement embodies a resolution of any potential relief for all claims raised, or that could have been raised, in this litigation.  While its provisions are binding on Defendant and Plaintiffs' Counsel, its provisions are not to be construed to be statements, rulings, or precedents with respect to the constitutional and other legal rights of persons who are nonparties to this litigation, in this, or any other action.

21.     Plaintiffs agree that if approved this Agreement shall be a complete defense as to the Defendant and its officials, employees and agents to any claim, suit or action in any forum by Plaintiff Cherie Easterling, and all class members who do not opt-out, with regard to any claim raised, or that could have been raised in this litigation as to any class member or her heirs, assigns, administrators, representatives, executors and successors.  Defendant and Plaintiffs acknowledge that individual class members may object to the Court's approval of this Agreement, that the Court may grant class members the opportunity to opt-out of participation in this Agreement, and that the Court may refuse to approve this Agreement.

IV.     **GROSS BACK PAY**

22.     The State of Connecticut will pay, as satisfaction of back pay relief *(i.e.* gross class back pay relief), a total of $1,851,892.00 to class members by way of a single check payable to Plaintiffs' Counsel, Outten & Golden LLC, as trustee for Plaintiffs.  The payment will be made within thirty (30) days of the Effective Date of this Agreement.  The parties agree that such payment will represent a complete settlement of the class members' back pay relief.  The funds will be distributed on a pro-rata basis to participating class members by way of a methodology that will be proposed by Plaintiffs' Counsel and approved by the Court.  Except as specifically provided herein, the Defendant will not contest or otherwise participate in determining the methodology for distributing the back pay relief to each participating class member.

23.     As a part of the process for distribution of individual financial awards to participating class members, Defendant's counsel will provide Plaintiffs' Counsel with a list of outstanding liens, and the amount thereof, due and owing to the State of Connecticut for each participating class member.  Plaintiffs' Counsel agrees to deduct the amount of each such lien(s) from the disbursement to be made to each class member subject to such lien(s), and to remit those funds to the State of Connecticut at the time the disbursement check is sent to the class member.

24.     Plaintiffs and their counsel understand and agree that the State of Connecticut will report any payment pursuant to this Agreement to all appropriate taxing authorities, and that Defendant makes no representation regarding the tax consequences of such payment as to any class member.  Plaintiffs' Counsel agree to provide Defendant's counsel with a completed form

W-9 immediately upon the signing of this Agreement as a condition precedent to the payment set forth above.

25.     The parties agree that if any participating class member fails to deposit their award check within ninety (90) days of receipt, the award apportioned to that class member will be redistributed, on a pro-rata basis, to the class members that did deposit their award checks within ninety (90) days, by way of a methodology that will be proposed by Plaintiffs' Counsel and approved by the Court.

## V.     ONE-TIME PAYMENT IN LIEU OF RETROACTIVE SENIORITY

26.     In lieu of the majority of retroactive seniority relief to which class members may otherwise be entitled, for any class member hired as a Correction Officer (inclusive of completion of her working test period) through either of the two priority hiring processes (as described in more detail in the Joint Stipulation dated March 27, 2012 (ECF No. 187) and below), Defendant will make a one-time payment, in addition to the back pay award described above, in lieu of retroactive seniority relief, including, but not limited to: (1) seniority for the purposes of facility assignments; (2) shift assignments; (3) vacation requests; (4) promotions; (5) overtime assignments; and (6) order of layoffs and reemployment, but excluding the rate of pay and accrual benefits described in Section VIII.  For each such priority hire who applied for the CO position in 2004, the amount of such payment will be $8,078.   For each such priority hire who applied for the CO position in 2006, the amount of such payment will be $6,126.  No class member shall be eligible to receive more than one such payment.  In either instance, such payment shall be made to all successful priority hires, within thirty (30) days of their completion of the working test period for the CO position.  In addition, any other class member who was hired by the DOC as a CO during the damages period, who did not participate in the 2012

priority hiring process, and who submits the IRS or SSA authorization form to Plaintiffs' counsel in the time period required by Section XI, will be eligible to receive a payment in lieu of such retroactive seniority benefits; any such payment will be prorated to correspond to length of time of the lost seniority benefits (in such instance the Correction Officer will count towards the 28 priority hires permitted by this Agreement).  With respect to any payment referenced in this paragraph, the State of Connecticut or Department of Correction shall issue a check in the name of the recipient to Plaintiffs' Counsel, who will deliver the check to each such priority hire.

27.     Defendant may withhold the value of any final lien(s) due to the State of Connecticut from such payment referenced in the preceding paragraph.  Each class member hired as a Correction Officer at any time hereby waives any right to claim, in any forum, additional retroactive seniority benefits as a consequence of the claims raised or that could have been raised in this lawsuit that might otherwise be available through applicable statutes, regulations and/or collective bargaining agreements.

## VI.     ADDITIONAL PRIORITY HIRING AGREEMENT

28.     In addition to the March 27, 2012 Priority Hiring Agreement (ECF No.187) between the parties, Defendant agrees to offer a second priority hiring process to any class member who successfully completes the entire selection process for Correction Officer position during the first administration of the Correction Officer exam that occurs after the Effective Date of this Agreement.[1]  Accordingly, nothing in this Agreement is intended to or may be construed to require the Defendant (or the State of Connecticut) to provide notice of any kind to class members or Plaintiffs' Counsel prior to or at the time of the announcement of the next Correction Officer selection process.  Rather class members are encouraged to register for the e-alert program described on the website for the Connecticut Department of

---

[1]     Defendant represents that it expects that the Department of Administrative Services may administer the next CO examination in or around the year 2015 but is unable at this time to state with certainty when the administration of the examination will take place.

Administrative Services ("DAS").  Any class member who successfully completes the written exam and physical fitness test administered by DAS shall notify the Director of Recruitment for the DOC, within ten (10) business days of her notification of passage of the physical fitness test, that she is seeking employment as a priority hire in order to be eligible for such "priority hire" status under this Agreement. Plaintiffs' Counsel will encourage class members to provide such notice as soon as possible within the 10 business days allowed.  Such notice may be effected by way of an: (1) email to catherine.riberio@po.state.ct.us; (2) a letter sent to the attention of "Director of Recruitment - Department of Correction" via first class mail, certified mail, or overnight delivery to Department of Correction, 24 Wolcott Hill Road, Wethersfield, CT 06109; or (3) facsimile to (860) 692-6864.  Following receipt of such notification from the class member, the DOC will expedite the processing of the application of such class member and offer a CO position in the first class hired from the list of eligible candidates to any class member who successfully completes the entire CO selection process.

29.     The parties understand and agree that the total number of class members who may be granted priority hire status under this Agreement and the March 27, 2012 Priority Hiring Agreement shall not exceed 28.  In the event that the number of class members eligible for priority hiring status exceeds 28, the Defendant, in its sole discretion, will select the eligible class members to fill the priority hiring positions.  The Defendant's decision(s) will not be subject to challenge by Plaintiffs or their counsel, or to review by the Court, by way of this Agreement.  This Agreement should not, however, be construed as authorizing priority hiring decisions that violate any otherwise applicable law(s), statute(s) and regulation(s), including those pertaining to employment discrimination.  Eligible class members who participate in the second priority hiring process, and who are not selected for a priority hire position, may continue in the CO selection process as non-priority hire candidates.

## VII.   PENSION CREDIT

### A.   General Provisions

30.     The parties agree that the intent of this section of the Agreement is to allow up to

28 "eligible class members" to request and receive certain pension credit, upon fulfillment of the

requirements set forth below.  An "eligible class member" is a class member who, on the

Effective Date of this Agreement, is currently or was formerly employed in "state service" (as

defined in Conn. Gen. Stat. §5-154(m)), is otherwise eligible to participate in the State Employee

Retirement System (SERS), and/or is, or becomes eligible, pursuant to this agreement, the parties

further agree that:

(1)     no class member who requests pension credit under this Agreement may receive

such credit for any period of time for which she is already receiving SERS

pension credit of any kind.  However, any class member working in a hazardous

duty position on the Effective Date of this Agreement who has previously earned

non-hazardous duty pension credit for any portion of the damages period

described herein may, upon request, receive hazardous duty pension credit for

such non-hazardous duty state service upon fulfillment of the requirements set

forth in this Agreement.  In such a case, the class member may request a refund of

any employee contributions made in connection with the non-hazardous duty

credit, provided that any such refund will be applied to the employee contribution

required for the hazardous duty pension credit.

(2)     the receipt of  back pay relief pursuant to this Agreement does not, by itself,

establish a class member's eligibility to participate in SERS;

(3)     any class member who requests such pension credit must agree to fully complete

any required enrollment forms or other documentation required by the Office of

11

the State Comptroller ("OSC")/SERS and make any contributions required by

OSC/SERS within the time periods set forth below;

(4)     except as allowed by applicable statutes, rules and regulations governing the

SERS, no election made by a class member pursuant to this Agreement with

respect to pension credit may be revoked or modified;

(5)     the Defendant makes no representation regarding the individual tax consequences

or reporting requirements attributable to the receipt of pension credit pursuant to

this Agreement.  Class members should seek the advice of an accountant or other

tax professional to determine their individual tax liability due to any pension

credit; and

(6)     this provision regarding pension credit will be available to the first 28 class

members who receive pension credit of any type.  When 28 class members have

received pension credit pursuant to this Agreement, the obligation of the

Defendant and/or the State of Connecticut under this section of the Agreement

will end.

**B.     Pension Credit for 2012 Priority Hire Class Members**

31.     Each class member who has successfully completed the 2012 priority hiring

process set forth in the Joint Stipulation dated March 27, 2012 (ECF No. 187), may, upon

successful completion of the working test period for the Correction Officer position, request and

receive hazardous duty pension credit for all or part of the period of time from her Presumptive

Hire Date until November 2, 2012, but she shall be eligible to receive only one type of pension

credit for any period of time.  A class member who elects to request such pension credit shall be

responsible for paying to the OSC/SERS the employee contribution for such credit, the amount

of which will be determined by the OSC/SERS on a case-by-case basis in accordance with the law(s), statute(s), regulation(s) and collective bargaining agreement(s) that were in effect during the damages period.  The required employee contributions will be based on the rate of pay that the class member would have earned had she been employed as a Correction Officer by Defendant during the damages period, the amount of which will be determined by the OSC/SERS, based on the compensation figures contained in Tables 2 and 3 (Revised January 18, 2013) in the charts prepared by plaintiffs' expert, Marc Bendik, Jr. (attached hereto as Exhibit A).

  32. Any class member who elects to request such pension credit shall give notice of her intent to seek pension credit within sixty (60) days of the Effective Date of this Agreement, by completing a form to be provided to Plaintiffs' Counsel prior to the Effective Date of this Agreement, and returning it by first class mail, certified mail, or overnight delivery to Colin Newman, Assistant Director, Retirement Services Division, 55 Elm Street, Hartford, CT 06106. Each such class member agrees that the employee contribution required for such pension credit shall be withheld from her back pay award received pursuant to this Agreement.  In the event that the back pay award is less than the required employee contribution, the class member agrees to make the additional employee contribution in the time and manner to be determined by OSC/SERS.  In the event that the class member fails to make timely notification of her intent to seek such pension credit, fails to authorize the employee contribution to be withheld from her back pay award, or fails to timely make the employee contribution as required by OSC/SERS, she will not receive such pension credit.

**C.**    **Pension Credit for Class Members Hired Through Second Priority Hiring Process**

33.    Each class member who successfully completes the second priority hiring process described above may, upon successful completion of the working test period for the Correction Officer position, request hazardous duty pension credit for all or part of the Damages Period, but shall be eligible to receive only one type of pension credit for any period of time.  Such class members who are otherwise eligible shall receive such pension credit only if fewer than 28 class members have previously received pension credit in any amount under this provision of the Agreement.   Any class member who elects to request and is approved to receive such pension credit shall be responsible for paying to the OSC/SERS the employee contribution for such credit, plus interest on that employee contribution for the period beginning on November 2, 2012 and ending on the date the employee contribution is made, the amount of which will be determined by the OSC/SERS in accordance with the laws(s), statute(s), regulation(s) and collective bargaining agreement(s) that were in effect during the damages period.  The required employee contributions will be based on the rate of pay that the class member would have earned had she been employed as a Correction Officer by Defendant during the damages period, the amount of which will be determined by the OSC/SERS, based on the compensation figures contained in Tables 2 and 3 (Revised January 18, 2013) in the charts prepared by plaintiffs' expert, Marc Bendik, Jr. (Exhibit A).  Any class member who is hired under the second priority hiring process, and who elects to request such pension credit, shall give notice of her intent to seek pension credit within sixty (60) days of being employed by the DOC, by completing a form to be provided by Defendant to Plaintiffs' Counsel prior to the Effective Date of this Agreement, and returning it by first class mail, certified mail, or overnight delivery to Colin Newman, Assistant Director, Retirement Services Division, 55 Elm Street, Hartford, CT 06106.  The class

member must make the required employee contribution within sixty (60) days of completion of her working test period in order to receive such pension credit.  In the event that the class member fails to make timely notification of her intent to seek such pension credit or fails to timely make the employee contribution, including the required interest, as required by OSC/SERS she will not receive such pension credit.

### D. Pension Credit for Non-Priority Hire Class Members Currently Working In Hazardous Duty Positions

34.     Each class member who is employed by the State of Connecticut in a hazardous duty position on the Effective Date of this Agreement, other than those class members hired through the first or second priority hiring process referenced above, may request and receive hazardous duty pension credit for all or part of her applicable Damages Period, but shall be eligible to receive only one type of pension credit for any period of time.  Any class member who elects to request such pension credit shall be responsible for paying to the OSC/SERS the employee contribution for such credit, the amount of which will be determined by the OSC/SERS in accordance with the law(s), statute(s), regulation(s) and collective bargaining agreement(s) that were in effect during the Damages Period.  The required employee contributions will be based on the rate of pay that the class member would have earned had she been employed as a Correction Officer by Defendant during the Damages Period, the amount of which will be determined by the OSC/SERS, based on the compensation figures contained in Tables 2 and 3 (Revised January 18, 2013) in the charts prepared by Plaintiffs' expert, Marc Bendik, Jr.  (Exhibit A).   Any class member who elects to request such pension credit shall give notice of her intent to seek pension credit within sixty (60) days of the Effective Date of this Agreement, by completing a form to be provided to Plaintiffs' Counsel prior to the Effective Date of this Agreement, and returning it by first class mail, certified mail, or overnight delivery

to Colin Newman, Assistant Director, Retirement Services Division, 55 Elm Street, Hartford, CT

06106.  Each such class member agrees that the employee contribution required for such pension

credit shall be withheld from her back pay award received pursuant to this Agreement.  In the

event that the back pay award is less than the required employee contribution, the class member

agrees to make the additional employee contribution in the time and manner to be determined by

OSC/SERS.  In the event that the class member fails to make timely notification of her intent to

seek such pension credit, fails to authorize the employee contribution to be withheld from her

back pay award, or fails to timely make the employee contribution as required by OSC/SERS,

she will not receive such pension credit.

      **E.**    **Pension Credit for Class Members Currently Working In Non-Hazardous Duty Positions Or Otherwise Eligible To Participate in SERS.**

      35.    Each eligible class member who works in state service in a non-hazardous duty

position, or who is otherwise eligible to participate in the SERS, on the effective date of this

Agreement (other than those class members described above) may request and receive regular

(non-hazardous duty) pension credit for all or part of the damages period, but shall be eligible to

receive only one type of pension credit for any period of time.   Any class member who elects to

request such pension credit shall be responsible for paying to the OSC/SERS the employee

contribution for such credit, the amount of which will be determined by the OSC/SERS in

accordance with the law(s), statute(s), regulation(s) and collective bargaining agreement(s) that

were in effect during the damages period.  The required employee contributions will be based on

the rate of pay that the class member would have earned had she been employed as a Correction

Officer by Defendant during the damages period, the amount of which will be determined by the

OSC/SERS, based on the compensation figures contained in Tables 2 and 3 (Revised January 18,

2013) in the charts prepared by plaintiffs' expert, Marc Bendik, Jr. (Exhibit A).  Any class

member who elects to request such pension credit shall give notice of her intent to seek pension credit within sixty (60) days of the Effective Date of this Agreement, by completing a form to be provided to Plaintiffs' Counsel prior to the Effective Date of this Agreement, and returning it by first class mail, certified mail, or overnight delivery to Colin Newman, Assistant Director, Retirement Services Division, 55 Elm Street, Hartford, CT 06106.  Each such class member agrees that the employee contribution required for such pension credit shall be withheld from her back pay award received pursuant to this Agreement.  In the event that the back pay award is less than the required employee contribution, the class member agrees to make the additional employee contribution in the time and manner to be determined by OSC/SERS.  In the event that the class member fails to make timely notification of her intent to seek such pension credit, fails to authorize the employee contribution to be withheld from her back pay award, or fails to timely make the employee contribution as required by OSC/SERS, she will not receive such pension credit.

      **F.**      **Irrevocability of Pension Credit Elections**

      36.      A class member's election of pension credit made pursuant to this Agreement shall be subject to modification only to the extent permitted by otherwise applicable Laws of the State of Connecticut, collective bargaining agreements, and/or OSC/SERS rules and regulations.

**VIII.  RATE OF PAY AND ACCRUAL OF RETROACTIVE RELIEF**

      37.      Upon successful completion of the working test period for the Correction Officer position, each class member hired by the Defendant through the application process associated with the 2012 Priority Hiring Agreement (ECF No. 187), will have her rate of base pay and/or overtime pay, as well as rate of accrual of vacation and sick pay, adjusted to the rate she would have received had she been hired on her Presumptive Hire Date.  Each

such class member's rate of pay and rate of accrual will thereafter be based upon her Presumptive Hire date.

38.     Class members who did not participate in the 2012 priority hiring process, who are Correction Officers on the Effective Date of this Agreement, and who submit the IRS or SSA authorization form to Plaintiffs' counsel in the time period required by Section XI, will also have their rate of base pay and/or overtime pay, as well as rate of accrual of vacation and sick pay, adjusted to the rate she would have received had she been hired on her Presumptive Hire Date instead of her actual hire date (in such instance the Correction Officer will count towards the 28 priority hires permitted by this Agreement).

39.     Each class member hired through the second priority hiring process will, upon successful completion of her working test period, have her rate of base pay and/or overtime pay, as well as rate of accrual of vacation and sick pay, adjusted as though she had been employed during her damages period, but will in no such case receive any such adjustment for the period between November 2, 2012 and her actual hire date.

40.     The aspect of relief described in this section does not involve any additional payment of back pay, and only serves to prospectively modify the rate of base and overtime pay, and accrual of vacation and sick time once such a class member completes the working test period for the Correction Officer position.

## IX.     INCENTIVE PAYMENT TO CHERIE EASTERLING

41.     Defendant will not oppose a request for an incentive payment, of up to $10,000, to Named Plaintiff Cherie Easterling for services rendered on behalf of the class, which will be provided from the settlement funds concerning back pay relief to the Class, and will be in addition to her award of back pay.

## X.       NO REVERSION

42.     There will be no reversion to Defendant of any monetary portion of the back pay settlement amount.  In the event that any check issued by the State of Connecticut pursuant to this Agreement expires prior to being redeemed by the payee, such funds will be redistributed to the class members participating in the settlement by way of a methodology that will be proposed by Plaintiffs' Counsel and approved by the Court.  Any additional payments made to class members as a result will also be subject to any applicable final liens, as described more fully above.

## XI.      CLASS MEMBERS ENTITLED TO PAYMENT/BENEFITS

43.     The parties agree that only class members selected as priority hires in the 2012 or forthcoming second priority hiring processes, and/or from whom Plaintiffs' Counsel have received an IRS or SSA authorization form within sixty (60) days of the class members' receipt notice of final approval of settlement, will be eligible to receive any monetary or other benefit under this Agreement.

## XII.     WAIVER OF RIGHT OF APPEAL

44.     The parties agree that by entering into this agreement they are waiving any right of appeal of any and all decisions and rulings of the District Court in this case.

## XIII.    RESOLUTION OF DISPUTES CONCERNING THIS AGREEMENT

45.     Any disputes regarding the interpretation of this Agreement, including, but not limited to, resolution of any dispute concerning liens asserted against the back pay awards by SERS, will be submitted to the District Court for resolution.

## XIV.     RELEASE

46.     Upon the Effective Date of this Agreement, each and every member of the

Plaintiff Class, for themselves, their heirs and assigns, voluntarily and knowingly release and

discharge the Defendant, as well as any agents and employees of the Defendant, any agency of

the State of Connecticut or any other former, current or future officers, servants, agents or

employees of the State of Connecticut, both in their official and individual capacities, and the

State of Connecticut itself (hereinafter "releasees"), from any and all claims, demands,

obligations, actions, causes of action, lawsuits, administrative proceedings, rights, damages,

costs, loss of services, expenses and compensation of any nature whatsoever, whether based on

tort, contract or other theory of recovery, that were brought or could have been brought in this

lawsuit during the class period as defined by the Court in its November 22, 2011 Certification

Order.  (ECF No. 156)

## XV.   NOTICE TO THE CLASS.

47.     The parties agree that the Court's approval of a notice regarding preliminary and

final approval of settlement by the Court precludes any subsequent argument that notice to the

class was not adequate.  Plaintiffs' Counsel will not at any time contend that a class member who

does not receive the notice approved by the Court and fails to file a timely claim is still eligible

for relief of any kind.

## XVI.   COSTS AND ATTORNEYS' FEES

48.     The State of Connecticut will pay a total of $1,232,463 to Plaintiffs' Counsel by way of a

single check payable to Outten & Golden LLC for attorneys' fees and costs.  The payment will be made

within thirty (30) days of the Effective Date of this Agreement.  The parties agree that such payment

represents a complete settlement of any and all claims for Plaintiffs' entitlement to attorneys' fees and

costs in this case through the termination of the case, including the disbursement of the settlement

proceeds to class members. Outten & Golden LLC will remit $70,000 of this total to Public Citizen Litigation Group as attorneys' fees.

## XVII.  CONSTRUCTION OF THIS AGREEMENT

49.    For purposes of construing this Agreement, neither party shall be considered its sole or primary author.  It is a jointly-drafted document.  Any rules of construction that interpret agreement terms against the drafter shall not apply.   This Agreement shall be construed under and governed by the laws of the State of Connecticut.

**IT IS SO STIPULATED.**


**THE EASTERLING V. STATE OF CONNECTICUT, DEPARTMENT OF CORRECTION, ET AL. CLASS PLAINTIFFS**


By_____   Date _____

Adam T. Klein

**OUTTEN & GOLDEN LLP**
Adam T. Klein (phv02892)
Tammy Marzigliano (ct23326)
Cyrus E. Dugger (phv05016)
Outten & Golden LLP
3 Park Avenue, 29th Floor
New York, NY 10016
Telephone: (212) 245-1000
Facsimile: (212) 977-4005
Email: atk@outtengolden.com

*Attorneys for Plaintiffs and the Class*


By _____   Date _____

Michael T. Kirkpatrick

**PUBLIC CITIZEN LITIGATION GROUP**
Michael T. Kirkpatrick (phv02893)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC  20009
Telephone: (202) 588-1000
Facsimile: (203) 588-7795
Email: mkirkpatrick@citizen.org

*Attorneys for Plaintiffs and the Class*

**THE DEFENDANT**
**STATE OF CONNECTICUT,**
**DEPARTMENT OF CORRECTION**

**GEORGE JEPSEN**
**ATTORNEY GENERAL**

By _____     Date _____
Margaret Q. Chapple


Margaret Q. Chapple (ct0550)
Associate Attorney General
Maura Murphy-Osborne (ct19987)
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5315
Fax: (860) 808-5387
E-mail:  Margaret.Chapple@ct.gov

**IT IS SO STIPULATED.**

**THE EASTERLING V. STATE OF CONNECTICUT, DEPARTMENT OF CORRECTION, ET AL. CLASS PLAINTIFFS**

By _____   Date _____

Adam T. Klein

**OUTTEN & GOLDEN LLP**
Adam T. Klein (phv02892)
Tammy Marzigliano (ct23326)
Cyrus E. Dugger (phv05016)
Outten & Golden LLP
3 Park Avenue, 29th Floor
New York, NY 10016
Telephone: (212) 245-1000
Facsimile: (212) 977-4005
Email: atk@outtengolden.com

*Attorneys for Plaintiffs and the Class*


By _____   Date _____

Michael T. Kirkpatrick

**PUBLIC CITIZEN LITIGATION GROUP**
Michael T. Kirkpatrick (phv02893)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC  20009
Telephone: (202) 588-1000
Facsimile: (203) 588-7795
Email: mkirkpatrick@citizen.org

*Attorneys for Plaintiffs and the Class*

**IT IS SO STIPULATED.**


**THE EASTERLING V. STATE OF CONNECTICUT, DEPARTMENT OF
CORRECTION, ET AL. CLASS PLAINTIFFS**


By_____   Date _____

Adam T. Klein

**OUTTEN & GOLDEN LLP**
Adam T. Klein (phv02892)
Tammy Marzigliano (ct23326)
Cyrus E. Dugger (phv05016)
Outten & Golden LLP
3 Park Avenue, 29th Floor
New York, NY 10016
Telephone: (212) 245-1000
Facsimile: (212) 977-4005
Email: atk@outtengolden.com

*Attorneys for Plaintiffs and the Class*


By _____ Date _5/3/2013_

Michael T. Kirkpatrick

**PUBLIC CITIZEN LITIGATION GROUP**
Michael T. Kirkpatrick (phv02893)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC  20009
Telephone: (202) 588-1000
Facsimile: (203) 588-7795
Email: mkirkpatrick@citizen.org

*Attorneys for Plaintiffs and the Class*

THE DEFENDANT
STATE OF CONNECTICUT,
DEPARTMENT OF CORRECTION

GEORGE JEPSEN
ATTORNEY GENERAL

By _Margaret Q. Chapple_   Date _07/11/2013_
Margaret Q. Chapple


Margaret Q. Chapple (ct0550)
Associate Attorney General
Maura Murphy-Osborne (ct19987)
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5315
Fax: (860) 808-5387
E-mail:  Margaret.Chapple@ct.gov

23

# Exhibit A

*Confidential Work Product for Purposes of Settlement Only*

## Table 1 - Revised January 18, 2013
## Present Value (as of August 31, 2013) of Economic Damages
## including All Fringe Benefits

|   | (a) | (b) | (c) |
|---|-----|-----|-----|
|   | **Group** | **Exam** | **Present Value of Damages** |
| (1) | For One CO | Exam 04190 | $80,782 |
| (2) |  | Exam 060700 | $61,258 |
| (3) | For 28 COs | 7 from Exam 04190 | $565,474 |
| (4) |  | 21 from Exam 060700 | $1,286,418 |
| (5) |  | **Total for 28 Cos** | **$1,851,892** |

Sources
Row (1):   Table 2, Row (17) of Column
Row (2):   Table 3, Row (17) of Column
Row (3):   Row (1) * 7
Row (4):   Row (2) * 21
Row (5):   Row (12) + Row (13)

**Table 2  - Revised January 18, 2013**

**Estimated Economic Damages in Selected Years, for the Average CO Hired under Examination 041930**

**Including All Fringe Benefits Except Retirement**

| | (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | Year | 10 Week Training Period 10/9/2005 - 12/16/2005 | 2 Weeks Post-Training 12/2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 (1/1/2012 - 11/2/2012) | Total 10/9/2005 - 11/2/2012 |
| | **I.  Total Compensation Per Employee in Corrections Career** | | | | | | | | | | |
| (2) | Grade/Step | Cadet | Grade 1 Step 1 | Grade 1 Step 1 | Grade 1 Step 2 | Grade 1 Step 3 | Grade 1 Step 4 | Grade 1 Step 5 | Grade 1 Step 5 | Grade 1 Step 5 | |
| (3) | Base Salary - Annual Rate | $32,564 | $27,526 | $27,939 | $29,649 | $31,432 | $33,223 | $35,042 | $35,475 | $35,475 | |
| (4) | Base Salary - Damages Period | $6,262 | $1,059 | $27,939 | $29,649 | $31,432 | $33,223 | $35,042 | $35,475 | $30,017 | |
| (5) | Night &Weekend Shift Differentials | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| (5a) | Value of Seniority | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| (6a) | Vacation Days | $388 | $66 | $1,792 | $1,908 | $2,023 | $2,094 | $2,223 | $2,262 | $1,920 | |
| (6b) | Holidays | $296 | $50 | $1,333 | $1,419 | $1,504 | $1,598 | $1,638 | $1,667 | $1,415 | |
| (6c) | Sick Leave | $163 | $28 | $781 | $881 | $934 | $992 | $995 | $1,071 | $779 | |
| (6d) | Other Paid Time Off (family leave, etc. | $61 | $10 | $322 | $245 | $207 | $220 | $234 | $238 | $173 | |
| (6e) | Life Insurance | $9 | $1 | $45 | $50 | $53 | $73 | $77 | $74 | $63 | |
| (6f) | Medical Insurance | $874 | $148 | $3,914 | $4,367 | $4,576 | $5,046 | $5,354 | $5,421 | $4,587 | |
| (6g) | Disability Insurance | $31 | $5 | $92 | $98 | $104 | $110 | $117 | $119 | $101 | |
| (6h) | Employer Contributions to Retirement | -- | -- | -- | -- | -- | -- | -- | -- | -- | |
| (6i) | Legally-Mandated Employer Contributions to Social Security, Medicare, and Unemployment Comp. | $497 | $84 | $2,168 | $2,295 | $2,433 | $2,638 | $2,737 | $4,047 | $3,386 | |
| (6j) | All Other Fringe Benefits (tuition, credit union, etc.) | $20 | $3 | $91 | $97 | $102 | $108 | $114 | $116 | $98 | |
| (7) | Overtime Pay | $0 | $263 | $6,929 | $7,353 | $7,795 | $8,239 | $8,690 | $8,798 | $7,444 | |
| (8) | Total Compensation | $8,601 | $1,717 | $45,405 | $48,360 | $51,164 | $54,341 | $57,221 | $59,288 | $49,983 | $376,080 |

| | **II. Total Compensation Per Employee in Alternative Career** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| (9) | Total Earnings (wages, salaries, etc.) | $4,569 | $952 | $24,846 | $29,079 | $30,756 | $31,951 | $31,469 | $32,684 | $27,656 | |
| (10) | 50% of Average Unemploy. Comp. | $0 | $0 | $4,354 | $0 | $0 | $0 | $0 | $0 | $0 | |
| (11a) | Vacation Days | $202 | $42 | $1,173 | $1,416 | $1,498 | $1,511 | $1,490 | $1,601 | $1,357 | |
| (11b) | Holidays | $202 | $42 | $818 | $917 | $1,013 | $1,007 | $993 | $989 | $838 | |
| (11c) | Sick Leave | $65 | $14 | $391 | $458 | $485 | $504 | $497 | $518 | $439 | |
| (11d) | Other Paid Time Off (family leave, etc.) | $26 | $5 | $178 | $125 | $132 | $137 | $181 | $188 | $160 | |
| (11e) | Life Insurance | $13 | $3 | $71 | $83 | $88 | $92 | $90 | $94 | $80 | |
| (11f) | Medical Insurance | $495 | $103 | $2,737 | $3,250 | $3,481 | $3,754 | $3,793 | $3,956 | $3,392 | |
| (11g) | Disability Insurance | $20 | $4 | $107 | $125 | $132 | $137 | $135 | $94 | $120 | |
| (11h) | Employer Contributions to Retirement | -- | -- | -- | -- | -- | -- | -- | -- | -- | |
| (11i) | Legally-Mandated Employer Contributions to Social Security, Medicare, and Unemployment Comp. | $527 | $110 | $2,844 | $3,291 | $3,437 | $3,550 | $3,522 | $3,626 | $3,113 | |
| (11j) | All Other Fringe Benefits (tuition, credit union, etc.) | $1 | $0 | $4 | $4 | $4 | $5 | $4 | $5 | $4 | |
| (12) | Total Compensation | $6,119 | $1,275 | $37,521 | $38,748 | $41,027 | $42,647 | $42,174 | $43,756 | $37,158 | $290,424 |
| | **III. Difference in Total Compensation between the Two Careers** | | | | | | | | | |
| (13) | Difference in Total Compensation | $2,482 | $441 | $7,885 | $9,612 | $10,137 | $11,694 | $15,048 | $15,532 | $12,825 | $85,656 |
| | **IV. Present Value of Difference in Total Compensation between the Two Careers** | | | | | | | | | |
| (14) | Interest from Approximate Midpoint of this Period to 8/31/2012 | $419 | $73 | $1,221 | $1,269 | $1,111 | $1,025 | $994 | $699 | $312 | $7,123 |
| (15) | Present Value on 8/31/2013 of Difference in Total Compensation (No Attrition) | $2,901 | $515 | $9,106 | $10,881 | $11,248 | $12,719 | $16,042 | $16,230 | $13,137 | $92,779 |
| | **V. Taking Account of Attrition from the Corrections Career** | | | | | | | | | |
| (16) | Percent of CO Hires Still Employed as COs | 100.0% | 100.0% | 92.2% | 90.5% | 88.8% | 87.1% | 85.4% | 83.7% | 82.0% | |
| (17) | **Present Value on 8/31/2013 of Difference in Total Compensation (Incorporating Attrition)** | $2,901 | $515 | $8,396 | $9,847 | $9,988 | $11,078 | $13,700 | $13,585 | $10,772 | **$80,782** |

**Notes and Sources:**

Row (1):  According to Marc Bendick, Jr., *Selected Calculations Related to Easterling et al. v. Connecticut Department of Correction* (May 18, 2012), Table One, the average start date for persons hired from this exam is October 7, 2005.  Therefore, Column (b) assumes a 10-week training period, Oct. 9, 2005 - December 16, 2005.  Column (c) covers the two weeks of 2005 remaining after training.  Column (j) covers through November 2, 2012.  In all other years, the CO is assumed to be employed for the full year.  (See also attrition adjustments subsequently made in Row (16).)

Row (2):  This analysis conservatively assumes that the average CO who remains continuously employed advances one step per year but remains in Grade 1 through December 31, 2012.  However, calculations for 2011 and 2012 assume that, under an agreement with the union, no step increases were implemented starting July 2011.

Row (3):  All figures are based on *Collective [NP-4] Bargaining Unit Contract between State of Connecticut and Council 4 of the American Federal of State, County and Municipal Employees Effective July 1, 2004 Expiring June 30, 2008*, Appendix on NP-4 Pay Plans, 36.5 hour week, or *Collective [NP-4] Bargaining Unit Contract between State of Connecticut and Council 4 of the American Federal of State, County and Municipal Employees Effective July 1, 2008 Expiring June 30, 2011,* Appendix on NP-4 Pay Plans, 36.5 hour week.  In Column (b), figure is Correction Cadet annual rate effective 6/24/05.  In Column (c), figure is CO Step 1 rate effective 6/24/05.  In Column (d), figure is the average of CO Step 1 rate effective 6/24/05 and CO Step 1 rate effective 6/23/06.  In Column (e), figure is the average of CO Step 2 rate effective 6/23/06 and CO Step 2 rate effective 6/22/07.  In Column (f), figure is the average of CO Step 3 rate effective 6/22/07 and CO Step 3 rate effective 7/4/2008.  In Column (g), figure is the average of CO Step 4 rate effective 7/4/2008 and CO Step 4 rate effective 6/24/2009.  In Column (h), figure is the average of CO Step 5 rate effective 6/24/09 and CO Step 5 rate effective 6/23/10.  In Column (i), figure is the CO Step 5 rate effective 6/23/10.  In Column (j), figure is the CO Step t rate effective 6/23/10.  Thus, the calculations assume that no across-the-board raise occurred after 6/23/2010 and, as noted in the note for Row (2), no step increases were implemented after 6/23/2010.

Row (4):  Row (3) * fraction of year the CO is assumed to be employed as a CO.  This fraction is 100% of the year for all years except 2005 and 2012.  In 2005, Column (b) reflects 10 weeks of employment (in training), and Column (c) reflects 2 weeks of post-training employment.  In 2012, Column (k) reflects 44 weeks of employment through November 2, 2012.

Row (5): Under a 36.25 hours week, a CO works 1,885 hours per year.  A night shift is defined in the *Collective Bargaining Agreement* (e.g., page 41 of the 2004 CBA) as starting between 2 PM and 6AM, or 16/24th of the day, implying that it applies to about 1,257 hours per year.  A weekend is defined in the *Collective Bargaining Agreement* as from third shift on  Friday through second shift on Sunday, or about 2/7 of the week, implying that it applies to about 538 hours per year.  The night differential was $.80 per hour through 7/2008 and $.90 per hour thereafter.  The weekend differential was $.55 per hour through 7/2008 and $.65 per hour thereafter.  Accordingly, the total night differential in 2005 was 72.5*16/24 * .80 = $39, while the total weekend differential was 72.5 *2/7 * .55 = $12, for a total of $51.  In 2006 and 2007, the total annual night differential was 1,257 * .80 = $1,006, while the total annual weekend differential was 538 * .55 = $296, for an annual total of $1,302.  In 2008, the total night differential was 1,257 * .825 = $1,037, while the total weekend differential was 538 * .575 = $309, for a total of $1,346.  In 2009, 2010, and 2011, , the total annual night differential was 1,257 * .90 = $1,131, while the total annual weekend differential was 538 * .65 = $350, for an annual total of $1,481.  In 2012, the figures are the corresponding figures for 2011 multiplied by 44/52.

Row (5a):  These figures represent the value to COs of seniority for purposes such as transfers, shift assignments, promotions, layoffs, and overtime holdover.  By negotiated agreement between the parties, this figure is set at $0 in all time periods.

Rows (6a)-(6j):

Row (6h):  By agreement between plaintiffs and defendants, employer contributions to retirement are being addressed separately and are therefore excluded from these calculations.

Rows (6e), (6f) and (6i):  The state of Connecticut has provided the following rates of fringe benefits for each $1 of CO base earnings (FY 2010-2011 figures are applied to 2011 and 2012):

*Fringe Benefits Rates  - Corrections Career*

| Year | Late 2005 | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|
| Life Insurance | 0.14% | 0.14% | 0.16% | 0.17% | 0.17% | 0.22% | 0.22% | 0.21% | 0.21% |
| Medical Insurance | 13.96% | 13.96% | 14.01% | 14.73% | 14.56% | 15.19% | 15.28% | 15.28% | 15.28% |
| Legally-Mandated Employer Contributions to Social Security, Medicare, & Unemployment Compensation | 7.93% | 7.93% | 7.76% | 7.74% | 7.74% | 7.94% | 7.81% | 11.41% | 11.28% |

Accordingly, the entries in Rows (6e), (6f), and (6i) are the corresponding entries in Row (4) multiplied by these rates.

Rows (6a), (6b), (6c), (6d), (6g), and (6j):   The U.S. Bureau of Labor Statistics [Employer Costs for Employee Compensation (www.bls.gov/news.release/archive/ecec, downloaded May 17, 2012), Table 3], reports that state and local government service employers (such as COs) received the rate of fringe benefits for each $1 in base salary:

| Year | Late 2005 | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|
| Vacation Days | 6.2% | 6.2% | 6.4% | 6.4% | 6.4% | 6.3% | 6.3% | 6.4% | 6.4% |
| Holidays | 4.7% | 4.7% | 4.8% | 4.8% | 4.8% | 4.8% | 4.7% | 4.7% | 4.7% |
| Sick Leave | 2.6% | 2.6% | 2.8% | 3.0% | 3.0% | 3.0% | 2.8% | 3.0% | 2.6% |
| Other Paid Time Off (family leave, etc.) | 1.0% | 1.0% | 1.2% | 0.8% | 0.7% | 0.7% | 0.7% | 0.7% | 0.6% |
| Disability Insurance | 0.5% | 0.5% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| All Other Fringe Benefits (tuition, credit union, etc.) | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |

Accordingly, the entries in Rows (6a), (6b), (6c), (6d), (6g), and 6(j) are the corresponding entries in Row (4) multiplied by these rates.

Row (7):  In *Defendant's Second Response to Plaintiffs' Third Request For Production,* defendant produced an EXCEL spreadsheet reporting total base pay and total overtime pay from September 2, 2004 through June 2, 2011 for 223 COs hired through Exam 041930. According to page 11of that spreadsheet, these employees earned an average of $.248 in overtime pay for each $1.00 of base pay. Accordingly, Row (6) = Row (4) * .248.  Column (b) assumes that no overtime pay was earned by cadets during training.

Row (8) = Row (4) + Row (5) + Row (5a) + Row (6a) through 6(j) + Row (7).

Row (9):  Figures are the average in each year of (a) average total annual earnings reported by claimants to IRS, according to IRS records, and (b) average total earnings reported  by claimants to the Social Security Administration (SSA), according to SSA records.  Entries of zero (which are rare) are included in computing averages. Figures for 2005 in Columns (b) and (c) are pro-rated for part year. Figure for 2012 is the same as for 2011, truncated on November 2, 2012.

Row (10):  Average unemployment compensation reported to the IRS, data as of 10/3/2012; zeros are included in computing average.  Assumed received in first full year of alternative employment, 2006.  Figure is reduced to 50% of reported amount to implement an agreement between plaintiffs and defendants.

Row (11):  The U.S. Bureau of Labor Statistics [*Employer Costs for Employee Compensation* (www.bls.gov/news.release/archive/ecec, downloaded May 17, 2012), Table 1], reports that all employees nationwide received the following amounts of fringe benefits for each $1 in wages and salaries as of December of each year (March data are used for 2012):

*Fringe Benefits - Alternative Employment*

| Year | Late 2005 | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|
| Vacation Days | 4.4% | 4.4% | 4.7% | 4.9% | 4.9% | 4.7% | 4.7% | 4.9% | 4.9% |
| Holidays | 4.4% | 4.4% | 3.3% | 3.2% | 3.3% | 3.2% | 3.2% | 3.0% | 3.0% |
| Sick Leave | 1.4% | 1.4% | 1.6% | 1.6% | 1.6% | 1.6% | 1.6% | 1.6% | 1.6% |
| Other Paid Time Off (family leave, etc.) | 0.6% | 0.6% | 0.7% | 0.4% | 0.4% | 0.4% | 0.6% | 0.6% | 0.6% |
| Life Insurance | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| Medical Insurance | 10.8% | 10.8% | 11.0% | 11.2% | 11.3% | 11.7% | 12.1% | 12.1% | 12.3% |
| Disability Insurance | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.3% | 0.4% |
| Legally-Mandated Employer Contribs. (Social Security, Medicare, Unemployment Compensation) | 11.5% | 11.5% | 11.4% | 11.3% | 11.2% | 11.1% | 11.2% | 11.1% | 11.3% |
| All Other Fringe Benefits (tuition, credit union, etc.) | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% |

Accordingly, the entries in Rows (11a) - (11j) are the corresponding entries in Row (9) multiplied by these rates.

Row (12) = Row (9) + Row (10) +Row (11a) through (11j).

Row (13) =  Row (8) - Row (12).

Row (14) = Row (15) - Row (13).

Row (15):  The *Economic Report of the President 2011,* Table B-73 (http://www.gpo.gov/fdsys/browse, downloaded May 10, 2012) reports annual average interest rates on 90 day Treasury bills, a common measure of annual rates of return on personal investments for small, "unsophisticated" investors.  For 2005-2011, these rates averaged 2.02%.  Row (9) = Row (7) + interest on Row (7) at 2.02% compounded continuously from the approximate midpoint of each period to August 31, 2013.  August 31, 2013 is an assumed date on which class members will receive compensation payments, allowing time after a settlement agreement is reached for approval of the settlement by the state legislature, notice and fair hearing, final approval of the settlement, and distributions administration.

Row (16):  Lists of COs attiring from Classes 228-237 reported 49 separations during the first year from among 626 hires (7.8% of hires) and 53 separations (an average of 1.7% of hires per year) for subsequent years.  Accordingly, Row (16) assumes that 92.2% of 2005 hires remain employed during 2006, and that percentage is reduced by 1.7% in each subsequent year through 2012.

Row (17) = Row (15) * Row (16).

## Table 3 - Revised January 18, 2013
## Estimated Economic Damages in Selected Years, for the Average CO Hired under Examination 060700
## Including All Fringe Benefits Except Retirement

| | (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) |
|---|---|---|---|---|---|---|---|---|---|
| (1) | Year | 10 Week Training Period 12/10/2006 - 2/16/2007 | 45 Weeks Post-Training 2007 | 2008 | 2009 | 2010 | 2011 | 2012 (1/1/2012-11/2/2012) | **Total 12/10/2006 - 11/2/2012** |
| | **I. Total Compensation Per Employee in Corrections Career** | | | | | | | | |
| (2) | Grade/Step | Cadet | Grade 1 Step 1 | Grade 1 Step 1&2 | Grade 1 Step 2&3 | Grade 1 Step 3&4 | Grade 1 Step 4 | Grade 1 Step 4 | |
| (3) | Base Salary - Annual Rate | $33,542 | $28,863 | $30,391 | $32,145 | $32,271 | $34,474 | $34,474 | |
| (4) | Base Salary-Employed Period | $6,450 | $24,978 | $30,391 | $32,145 | $32,271 | $34,474 | $29,170 | |
| (5) | Night &Weekend Shift Differentials | $0 | $1,126 | $1,346 | $1,481 | $1,481 | $1,481 | $1,253 | |
| (5a) | Value of Seniority | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| (6a) | Vacation Days | $414 | $1,607 | $1,956 | $2,026 | $2,047 | $2,198 | $1,866 | |
| (6b) | Holidays | $308 | $1,195 | $1,454 | $1,546 | $1,508 | $1,620 | $1,375 | |
| (6c) | Sick Leave | $180 | $742 | $903 | $960 | $916 | $1,041 | $757 | |
| (6d) | Other Paid Time Off (family leave, et | $74 | $206 | $201 | $213 | $215 | $231 | $168 | |
| (6e) | Life Insurance | $10 | $42 | $52 | $71 | $68 | $72 | $61 | |
| (6f) | Medical Insurance | $904 | $3,679 | $4,425 | $4,883 | $4,931 | $5,268 | $4,457 | |
| (6g) | Disability Insurance | $21 | $82 | $100 | $107 | $108 | $116 | $98 | |
| (6h) | Employer Contributions to Retiremen | -- | -- | -- | -- | -- | -- | -- | |
| (6i) | Legally-Mandated Employer Contributions to Social Security, Medicare, and Unemployment | $501 | $1,933 | $2,352 | $2,552 | $2,520 | $2,692 | $2,278 | |
| (6j) | All Other Fringe Benefits (tuition, credit union, etc.) | $21 | $81 | $99 | $105 | $105 | $112 | $95 | |
| (7) | Overtime Pay | $0 | $6,194 | $7,537 | $7,972 | $8,003 | $8,550 | $7,234 | |
| (8) | Total Compensation | $8,883 | $41,868 | $50,816 | $54,060 | $54,174 | $57,855 | $48,813 | $316,469 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **II.  Total Compensation Per Employee in Alternative Career** | | | | | | | | |
| (9) Wages or Salary | $5,348 | $25,165 | $30,756 | $31,951 | $31,469 | $32,684 | $27,656 | |
| (10) 50% of Average Unemploy. Comp. | $0 | $4,354 | $0 | $0 | $0 | $0 | $0 | |
| (11a) Vacation Days | $252 | $1,226 | $1,498 | $1,511 | $1,490 | $1,601 | $1,357 | |
| (11b) Holidays | $176 | $793 | $1,013 | $1,007 | $993 | $989 | $838 | |
| (11c) Sick Leave | $84 | $397 | $485 | $504 | $497 | $518 | $439 | |
| (11d) Other Paid Time Off (family leave, et | $38 | $108 | $132 | $137 | $181 | $188 | $160 | |
| (11e) Life Insurance | $15 | $72 | $88 | $92 | $90 | $94 | $80 | |
| (11f) Medical Insurance | $589 | $2,812 | $3,481 | $3,754 | $3,793 | $3,956 | $3,392 | |
| (11g) Disability Insurance | $23 | $108 | $132 | $137 | $135 | $94 | $120 | |
| (11h) Employer Contributions to Retiremer | -- | -- | -- | -- | -- | -- | -- | |
| (11i) Legally-Mandated Employer Contributions to Social Security, Medicare, and Unemployment | $612 | $2,848 | $3,437 | $3,550 | $3,522 | $3,626 | $3,113 | |
| (11j) All Other Fringe Benefits (tuition, credit union, etc.) | $1 | $4 | $4 | $5 | $4 | $5 | $4 | |
| (12) Total Compensation | $7,139 | $37,886 | $41,027 | $42,647 | $42,174 | $43,756 | $37,158 | $251,786 |
| **III.  Difference in Total Compensation between the Two Careers** | | | | | | | | |
| (13) Difference in Total Compensation | $1,744 | $3,982 | $9,789 | $11,413 | $12,000 | $14,099 | $11,656 | $64,683 |
| **IV.  Present Value of Difference in Total Compensation between the Two Careers** | | | | | | | | |
| (14) Interest from Approximate Midpoint of this Period to 8/31/2012 | $218 | $450 | $922 | $827 | $615 | $429 | $117 | $3,579 |
| (15) Present Value on 8/31/2012 of Difference in Total Compensation (No Attrition) | $1,963 | $4,431 | $10,710 | $12,241 | $12,616 | $14,528 | $11,773 | $68,262 |
| **V.  Taking Account of Attrition from the Corrections Career** | | | | | | | | |
| (16) Percent of Hires Still Employed | 100.0% | 100.0% | 92.2% | 90.5% | 88.8% | 87.1% | 85.4% | |
| (17) **Present Value on 8/31/2012 of Difference in Total Compensation (Adjusted for Attrition)** | $1,963 | $4,431 | $9,875 | $11,078 | $11,203 | $12,654 | $10,054 | **$61,258** |

**Notes and Sources:**

Row (1):  According to Marc Bendick, Jr., *Selected Calculations Related to Easterling et al. v. Connecticut Department of Correction* (May 18, 2012), Table One, the average start date for persons hired from this exam is December 10, 2006.  Therefore, Column (b) assumes a 10-week training period, December 11, 2006 - February 16, 2007.  Column (c) covers the 45 weeks of 2007 remaining after training.  Column (h) covers through November 2, 2012.  In all other years, the CO is assumed to be employed for the full year.  (See also attrition adjustments subsequently made in Row (16).)

Row (2):  This analysis conservatively assumes that the average CO who remains continuously employed advances one step per year but remains in Grade 1 through December 31, 2012.  However, calculations for 2011 and 2012 assume that, under an agreement with the union, no step increases were implemented starting July 2011.

Row (3):  All figures are based on *Collective [NP-4] Bargaining Unit Contract between State of Connecticut and Council 4 of the American Federal of State, County and Municipal Employees Effective July 1, 2004 Expiring June 30, 2008*, Appendix on NP-4 Pay Plans, 36.5 hour week, or *Collective [NP-4] Bargaining Unit Contract between State of Connecticut and Council 4 of the American Federal of State, County and Municipal Employees Effective July 1, 2008 Expiring June 30, 2011,* Appendix on NP-4 Pay Plans, 36.5 hour week.  In Column (b), figure is Correction Cadet annual rate effective 6/23/06.  In Column (c), figure is the weighted average of the CO Step 1 rate effective 6/23/06 during March - June, the CO Step 1 rate effective 6/22/07 from July-December.  In Column (d), figure is the weighted average of the  CO Step 1 rate effective 6/22/07 during January - February, the CO Step 2 rate effective 6/22/07 during March - June, and the CO Step 2 rate effective 7/04/08 July - December.  In Column (e), figure is the weighted average of the  CO Step 2 rate effective 7/04/08 during January - February, the CO Step 3 rate effective 7/04/08 during March - June, and the CO Step 3 rate effective 6/24/09 during July - December.  In Column (f), figure is the weighted average of the  CO Step 3 rate effective 6/24/09 during January - February, the CO Step 4 rate effective 6/24/09 during March - June, and the CO Step 4 rate effective 6/23/10 during July - December. In Column (g) and Column (h), figure is the CO Step 4 rate effective 6/23/10.   Thus, the calculations assume that no across-the-board raise occurred after 6/23/2010 and, as noted in the note for Row (2), no step increases were implemented after 6/23/2010.

Row (4)  Row (3) * fraction of year the CO is assumed to be employed as a CO. This fraction is 100% of the year for all years except 2006 and 2007, where column (b) reflects 10 weeks of training employment (in late 2006 and early 2007), and column (c) reflects 45 weeks of post-training employment in 2007).  Also, in 2012, the figure in Column (h) reflects only the 44 weeks through November 2, 2012.

Row (5):  Under a 36.25 hours week, a CO works 1,885 hours per year.  A night shift is defined in the *Collective Bargaining Agreement* (e.g., page 41 of the 2004 CBA) as starting between 2 PM and 6AM, or 16/24th of the day, implying that it applies to about 1,257 hours per year.  A weekend is defined in the *Collective Bargaining Agreement* as from third shift on  Friday through second shift on Sunday, or about 2/7 of the week, implying that it applies to about 538 hours per year.  The night differential was $.80 per hour through 7/2008 and $.90 per hour thereafter.  The weekend differential was $.55 per hour through 7/2008 and $.65 per hour thereafter.  Accordingly, in 2007, the total annual night differential was 1,257 * .80 = $1,006, while the total annual weekend differential was 538 * .55 = $296, for a full-year total of $1,302 and a 45-week total of $1,1,26.  In 2008, the total night differential was 1,257 * .825 = $1,037, while the total weekend differential was 538 * .575 = $309, for a total of $1,346.  In 2009, 2010, and 2011, the total annual night differential was 1,257 * .90 = $1,131, while the total annual weekend differential was 538 * .65 = $350, for an annual total of $1,481.  In 2012, the figures are the corresponding figures for 2011 multiplied by 44/52.

Row (5a):  These figures represent the value to COs of seniority for purposes such as transfers, shift assignments, promotions, layoffs, and overtime holdover.  By negotiated agreement between the parties, this figure is set at $0 in all time periods.

Row (6a)-(6j):

Row (6h):  By agreement between plaintiffs and defendants, employer contributions to retirement are being addressed separately and are therefore excluded from these calculations.

Rows (6e), (6f), and (6i):  The state of Connecticut has provided the following rates of fringe benefits for each $1 of CO base earnings (FY2010-2011 figures are applied to 2011 and 2012):

*Fringe Benefits - Corrections Career*

| Year | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Life Insurance | 0.16% | 0.17% | 0.17% | 0.22% | 0.21% | 0.21% | 0.21% |
| Medical Insurance | 14.01% | 14.73% | 14.56% | 15.19% | 15.28% | 15.28% | 15.28% |
| Legally-Mandated Employer Contributions to Social Security, Medicare, and Unemployment Compensation | 7.76% | 7.74% | 7.74% | 7.94% | 7.81% | 7.81% | 7.81% |

Accordingly, the entries in Rows (6e), (6f), and (6i) are the corresponding entries in Row (4) multiplied by these rates.

Rows (6a), (6b), (6c), (6d), (6g), and (6j):  The U.S. Bureau of Labor Statistics [Employer Costs for Employee Compensation (www.bls.gov/news.release/archive/ecec, downloaded May 17, 2012), Table 3], reports that state and local government service employers (such as COs) received the following amounts of fringe benefits for each $1 in base salary:

*Fringe Benefits - Corrections Career*

| Year | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Vacation Days | 6.4% | 6.4% | 6.4% | 6.3% | 6.3% | 6.4% | 6.4% |
| Holidays | 4.8% | 4.8% | 4.8% | 4.8% | 4.7% | 4.7% | 4.7% |
| Sick Leave | 2.8% | 3.0% | 3.0% | 3.0% | 2.8% | 3.0% | 2.6% |
| Other Paid Time Off (family leave, etc.) | 1.2% | 0.8% | 0.7% | 0.7% | 0.7% | 0.7% | 0.6% |
| Disability Insurance | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| All Other Fringe Benefits (tuition, credit union, etc.) | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |

Accordingly, the entries in Rows (6a), (6b), (6c), (6d), (6g), and (6j) are the corresponding entries in Row (4) multiplied by these rates.

Row (7):  In Defendant's Second Response to Plaintiffs' Third Request For Production, defendant produced an EXCEL spreadsheet reporting total base pay and total overtime pay from September 2, 2004 through June 2, 2011 for 223 COs hired through Exam 041930.  According to page 11of this spreadsheet, these employees earned an average of $.248 in overtime pay for each $1.00 of base pay. Accordingly, Row (6) = row (4) * .248.  Column (b) assumes that no overtime pay was earned by cadets during training.

Row (8) = Row (4) + Row (5) + Row (5a) + Row (6) + Row (7).

Row (9):  Figures are the average in each year of (a) average total annual earnings reported by claimants to the IRS, according to IRS records, and (b) average total annual earnings reported by claimants to SSA, according to SSA records.  Entries of zero (which are rare) are included in computing averages.  Figures for 2006 and 2007 in Columns (b) and (c) are pro-rated for part year. Figure for 2012 is the same as for 2011, truncated as of November 2, 2012.

Row (10):  Average unemployment compensation reported to the IRS, data as of 10/3/2012;   zeros are included in computing average. Assumed received in late 2007. Figure is reduced to 50% of reported amount to implement an agreement between plaintiffs and defendants.

Row (11):  The U.S. Bureau of Labor Statistics [*Employer Costs for Employee Compensation* (www.bls.gov/news.release/archive/ecec, downloaded May 17, 2012), Table 1], reports that all employees nationwide received the following amounts of  fringe benefits for each $1 in base wages and salaries as of December of each year (March data is used for 2012):

*Fringe Benefits - Alternative Employment*

| Year | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Vacation Days | 4.7% | 4.9% | 4.9% | 4.7% | 4.7% | 4.9% | 4.9% |
| Holidays | 3.3% | 3.2% | 3.3% | 3.2% | 3.2% | 3.0% | 3.0% |
| Sick Leave | 1.6% | 1.6% | 1.6% | 1.6% | 1.6% | 1.6% | 1.6% |
| Other Paid Time Off (family leave, etc.) | 0.7% | 0.4% | 0.4% | 0.4% | 0.6% | 0.6% | 0.6% |
| Life Insurance | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| Medical Insurance | 11.0% | 11.2% | 11.3% | 11.7% | 12.1% | 12.1% | 12.3% |
| Disability Insurance | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.3% | 0.4% |
| Legally-Mandated Employer Contributions to Social Security, Medicare, and Unemployment Compensation | 11.4% | 11.3% | 11.2% | 11.1% | 11.2% | 11.1% | 11.3% |
| All Other Fringe Benefits (tuition, credit union, etc.) | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% |

Accordingly, the entries in Rows (11a) - (11j) are the corresponding entries in Row (9) multiplied by these rates.

Row (12) = Row (9) + Row (10) + Row (11a) through (11j).

Row (13) =  Row (8) - Row (12).

Row (14) = Row (15) - Row (13).

Row (15):  The *Economic Report of the President 2011,* Table B-73 (http://www.gpo.gov/fdsys/browse, downloaded May 10, 2012) reports annual average interest rates on 90 day Treasury bills, a common measure of annual rates of return on personal investments for small, "unsophisticated" investors.  For 2005-2011, these rates averaged 2.02%.  Row (9) = Row (7) + interest on Row (7) at 2.02% compounded continuously from the approximate midpoint of each period to August 31, 2013.  August 31, 2013 is an assumed date on which class members will receive compensation payments, allowing time after a settlement agreement is reached for approval of the settlement by the state legislature, notice and fair hearing, and distributions administration.

Row (16):  Lists of Cos attriting from Classes 228-237 reported 49 separations in the first year from among 626 hires (7.8% of hires) and 53 separations (an average of 1.7% of hires) for subsequent years.  Accordingly, Row (16) assumes that 92.2% of the class starting in late 2006 remain employed during 2008,and that percentage is reduced by 1.7% in each subsequent year through 2012.

Row (17) = Row (15) * Row (16).